2013 IL App (1st) 120901

THIRD DIVISION
October 9, 2013

No. 1-12-0901

| | | |
|---|---|---|
| TODD SMART, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 07 L 14089 |
| | ) | |
| THE CITY OF CHICAGO, a Municipal Corporation, | ) | The Honorable |
| | ) | Elizabeth M. Budzinski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Neville and Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1 Following trial, the jury returned a general verdict in favor of Todd Smart, who was injured while riding his bicycle on a bicycle path on a city street that was in the process of being resurfaced by the City of Chicago (City). The City claims that a new trial is warranted because the trial court erroneously refused to (1) submit a special interrogatory and (2) tender its proffered premises liability issues instruction to the jury. On appeal, the City claims that its special interrogatory was in proper form, asked a single, direct question that was not prejudicial to Smart, and tested the jury's general verdict. The City also claims that its proffered premises liability issues instruction should have been tendered to the jury because: (1) Smart's claims relate to the street's condition; (2) the City was not engaging in any activity on the day of Smart's accident; and (3) it does not operate a business. For the reasons stated below, we affirm.

¶ 2                                    BACKGROUND

¶ 3 Smart was injured on July 1, 2007, while riding on a bicycle path near the intersection of north Marcey Street and west Cortland Street in Chicago, Illinois. At the time of the accident,

Smart, an avid amateur athlete, was riding a triathlon road bicycle, which he had ridden previously thousands of times. He rode his bicycle eastbound on the south side of Cortland through the intersection of Cortland and Marcey. He had traveled on this same path leading to the intersection hundreds of times prior to the accident and never saw the intersection in the condition it was in on July 1, 2007.

¶ 4 A portion of the street leading to the intersection is designated as a bicycle route, which is apparent by the silhouette of a bicycle painted on the pavement between two solid white lines. Signs on street posts marked with the words "Lakefront Trail" are located along the path leading to the accident intersection, which also designate the street as a bicycle path. Vehicle traffic is located on both sides of the bicycle path that leads to the intersection. The bicycle path becomes a shared lane with vehicle traffic just past the intersection.

¶ 5 On the morning of the accident, Smart was riding his bicycle on the path to go home after playing tennis with a friend. He was wearing a helmet with a flashing light on the back, a yellow reflective bicycle windbreaker and special shoes that clip onto the bicycle's pedals.

¶ 6 As Smart approached the intersection, he noticed that the street's surface changed from a smooth to a rugged texture as a result of a resurfacing project. There was a lip at the edge of the resurfacing area where the removal of the top layer of asphalt caused a drop off. Smart was concerned about the rugged, deep groves of the street's surface because it created an inconsistency in the pavement making it difficult to keep a bicycle stable.

¶ 7 Upon noticing the condition of the intersection, Smart slowed his speed from 12 to 14 miles per hour to 6 to 10 miles per hour. Utility covers and, in particular, Commonwealth Edison (Com Ed) vault covers, which are normally flush with the pavement, were protruding above the

street's surface. As Smart approached one of the square Com Ed covers, he steered left to go around it at which point the front tire of his bicycle lodged in the roadway. The abrupt stop of Smart's bicycle propelled him over the handlebars and he landed on his left shoulder approximately six feet away.

¶ 8     After the fall, Smart got up, retrieved his bicycle, and walked to the median in the street so he would not be in the way of vehicle traffic. As Smart was trying to remove his jacket, a fire truck that was en route to get fuel pulled over to assist him. The firemen called an ambulance, which later transported Smart to the hospital.

¶ 9     As a result of the fall, Smart's left shoulder was fractured in multiple places and the humerus bone was dislocated and rotated from the socket. Smart had shoulder surgery on July 4, 2007, and a second surgery about a year later. The City does not raise any issue on appeal regarding the nature and extent of Smart's injuries or dispute that they are permanent and disabling.

¶ 10    A week after his accident, Smart and his wife took photographs of the street at the intersection. The condition of the street that caused the front of Smart's bicycle to become lodged was a "gash" or shallow trench to the side of the Com Ed vault that was approximately 2 inches deep, 5 inches long and 14 inches wide. The gash or shallow trench was not visible from any distance and was visible to Smart only as he stood almost directly on top of it. As he traveled through the intersection of Cortland and Marcey on July 1, 2007, the only options Smart had for avoiding the trench, had he seen it, were to veer right and hit the raised Com Ed vault or veer left into a lane of vehicular traffic.

¶ 11    Street resurfacing requires grinding, which is also referred to as milling, a process that removes the existing street surface. Grinding or milling is done in stages. A large grinder removes the bulk of the existing street surface to a depth of 1.5 inches and a sweeper at the rear of the grinder retrieves remaining milled asphalt pieces. Once the surface has been milled, a small grinder performs trim work, which would include chipping the asphalt around a structure, such as sewer or utility covers. Small grinding, if performed properly, should leave an incline around raised structures in the street so that the transition from the lower milled surface to the raised structure is not so abrupt.

¶ 12    In the City of Chicago, resurfacing projects are performed in phases. The large grinding work is done first. This initial work is performed and cleaned up in approximately a week. Small grinding work follows. The street is then resurfaced. This process typically takes about a month. The phased work is planned for the efficient use of City personnel and equipment. Efficiency considerations aside, the process of resurfacing a street can be completed in a day or two.

¶ 13    On July 1, 2007, both large and small grinding had been completed at the Cortland and Marcey intersection. Large grinding was completed on June 20; small grinding was completed on June 25. The small grinding left no transition between the removed street surface and the square Com Ed vaults. The shallow trench that caused Smart's front wheel to lodge was created by a small grinder being left on and standing in one place. The grinding at the intersection was performed in a bridge deck pattern that looked like a diamond with pronounced straight lines. The bridge deck pattern is used to increase asphalt adhesion and to achieve a flat surface for

purposes of adding a layer of asphalt. No other work was done at the intersection until July 10, 2007, when it was resurfaced.

¶ 14    On December 18, 2007, Smart filed a one-count negligence complaint against the City. The complaint asserted that the City owned, operated, maintained and controlled the south side of Cortland where he was riding his bicycle. Smart alleged that the City failed to maintain its property in a reasonably safe condition. The City answered the complaint and asserted multiple affirmative defenses under the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/2-201, 3-102, 3-104 (West 2006)) claiming that: (1) it maintained its property in a reasonably safe condition at all times and did not have actual or constructive notice of any alleged defect of its property; (2) it had no duty to provide warnings or barricades; and (3) its routing of traffic and placement of any barricades involved the determination of policy and exercise of discretion. The City also asserted that Smart was comparatively negligent. The City filed a motion *in limine* to bar testimony, argument and evidence relating to the City's alleged failure to provide warnings or barricades, which the trial court granted.

¶ 15    The City also filed a motion for summary judgment on November 9, 2010, asserting that it owed no duty to protect Smart from the street's open and obvious condition. The trial court denied the City's motion on January 12, 2011. The case proceeded to a jury trial.

¶ 16    Eugene Paul Holland, a consulting engineer architect, testified as an expert on Smart's behalf. Holland has worked on projects in the City since 1964, many of them involving the construction of streets. He is familiar with industry standards for resurfacing roadways.

¶ 17    With respect to the intersection where Smart's accident occurred, Holland described the

transition between the street's milled surface and the square utility cover located on the bicycle path as an abrupt change. Holland opined that industry standards required transition grinding between the top of the square utility cover and the street's surface to create a smooth transition between the two areas. Fine grinding should have been performed to create an incline between the utility cover and the exposed asphalt.

¶ 18    In Holland's view, the bridge deck pattern that created grooves in the street that went in multiple directions also created an unsafe condition. Holland believed that street grinding in multiple directions should be avoided because it prevents bicyclists and vehicles from proceeding on the street in a normal manner. It is not generally acceptable to leave a street in a condition where an uneven surface is present and its texture goes in multiple directions, which results from grinding and milling activities. The underlying defects in the street near the accident intersection in conjunction with the protruding utility cover created an unevenness in the street's surface posing a hazard to motorists and bicyclists. In Holland's opinion, had the City milled the street in one direction and smoothed its texture, the street's hazardous condition would have been diminished. Holland's opinion was that the type of construction work performed near the accident intersection can typically be completed in one day because asphalting normally immediately follows grinding or milling activities.

¶ 19    The City did not call an expert. The City's only witness was Philip Stephen, a City asphalt foreman who was present on June 20, 2007, when the surface of the street at the intersection was removed. Stephen was not present on June 25 when fine grinding was performed. Stephen testified that because of the size of the grinding machines, it is not possible

to grind an intersection in only one direction. Shown pictures of the scene, Stephen denied that there was any gash or shallow trench, referring to it instead as "concrete shadows." Stephen also insisted that the pictures depicted a street that was "pretty close to perfectly leveled."

¶ 20 During the jury instructions conference, Smart tendered Illinois Pattern Jury Instruction, Civil, No. 120.02 (2006) (hereinafter, IPI Civil (2006) No. 120.02) which is entitled "Duty To An Adult Lawfully On The Property - Condition of Property." IPI Civil (2006) No. 120.02 reads: "It was the duty of [the City], as an owner of the property in question, to exercise ordinary care to see that the property was reasonably safe for the use of those lawfully on the property." The notes to this instruction direct that it should be used if the injury was caused by the condition of property owned or operated by a local public entity.

¶ 21 Based on Smart's tender of IPI Civil (2006) No. 120.02, the City contended that the court should use Illinois Pattern Jury Instructions, Civil, No. 120.08 (2006) (hereinafter, IPI Civil (2006) No. 120.08), the premises liability issues and burden of proof instruction. IPI Civil (2006) No. 120.08 requires a plaintiff pursuing a premises liability claim to prove that (1) there was a condition on the property that presented an unreasonable risk of harm, (2) defendant knew or in the exercise of ordinary care should have known of both the condition and the risk, (3) defendant could not reasonably expect that people on the property would not discover or realize the danger, (4) defendant was negligent in specific ways, (5) plaintiff was injured, and (6) defendant's negligence was the proximate cause of plaintiff's injury.

¶ 22 Counsel for Smart objected to IPI Civil (2006) No. 120.08, citing the following Notes on Use to the instruction: "If the action alleges that an activity on the premises caused the injury or

that the dangerous condition arose as part of the defendant's business, use IPI 20.01 and IPI B10.03." Illinois Pattern Jury Instruction, Civil, No. 20.01 (2006) (hereinafter, IPI Civil (2006) No. 20.01) and Illinois Pattern Jury Instruction, Civil, No. B10.03 (2006), in turn, are instructions used in ordinary negligence cases. Smart's counsel also noted that the Notes on Use to IPI Civil (2006) No. 120.02 dictate the use of negligence instructions if a plaintiff is alleging that an activity of the property owner caused the injury. Counsel contended that the City's activity in resurfacing the street and leaving it in an unsafe condition proximately caused Smart's injuries and, therefore, the premises liability instruction should not be given. The City, however, asserted that the case was a premises liability case because Smart's allegations and basis for recovery concerned the street's condition and he failed to observe an open and obvious condition in the street. The City asserted that it was not engaging in any activity on the day of the accident and that as a municipality, it was not operating a business. The trial court agreed with Smart and refused to give IPI Civil (2006) No. 120.08.

¶ 23     Also during the jury instructions conference, the City submitted the following special interrogatory: "Was the contributory negligence of Todd Smart, if any, greater than 50% of the proximate cause of his injuries?" In response to the City's request for a special interrogatory, the trial court stated that the interrogatory would not test the jury's general verdict and could mislead or confuse the jury. The trial court refused the City's special interrogatory.

¶ 24     Following deliberations, the jury returned a general verdict in favor of Smart and awarded $1,917,119.67 in damages. The City filed a posttrial motion asserting that a new trial was warranted because the trial court erred in: (1) refusing its special interrogatory concerning

8

1-12-0901

Smart's contributory negligence; (2) tendering two duty instructions; (3) refusing its proffered IPI Civil (2006) No. 120.08; and (4) making numerous, erroneous evidentiary rulings. The trial court denied the City's posttrial motion on February 29, 2012, and the City timely appealed.

¶ 25                                   ANALYSIS

¶ 26                           A. Special Interrogatory

¶ 27    As a preliminary matter, Smart claims that the City has forfeited review of any error relating to the trial court's refusal of its special interrogatory because it failed to submit a revised special interrogatory. Smart contends that the trial court granted the City the opportunity to tender another interrogatory prior to the jury's deliberations.

¶ 28    We do not believe that the City has forfeited this claim of error. Review of an error is forfeited unless a party objects to the error at trial and includes the error in a posttrial motion. *Thorton v. Garcini*, 237 Ill. 2d 100, 106 (2010), *Ahmed v. Pickwick Place Owners' Ass'n*, 385 Ill. App. 3d 874, 888-89 (2008). The transcript of the jury instructions conference included in the record reveals that the City strongly advocated use of its special interrogatory and opposed the trial court's refusal to submit the interrogatory to the jury. The City also included its claim of error in its posttrial motion for a new trial.

¶ 29    Contrary to Smart's contention, the record does not reflect that the trial court encouraged the City to submit a revised special interrogatory. Rather, the court concluded that the interrogatory would not test a general verdict and refused to give it for this reason. Although the City could have submitted a revised interrogatory, its failure to do so does not preclude review of this claimed error.

9

¶ 30    Turning to the merits, the City claims the trial court erred in refusing to submit its special interrogatory to the jury because the interrogatory tested the jury's verdict and was in proper form. The City contends that its special interrogatory tested the general verdict because it asked the jury whether Smart's contributory negligence was greater than 50% of the proximate cause of his injuries. Because the verdict form returned by the jury did not address Smart's contributory negligence, the City claims that the special interrogatory would have tested that verdict and an affirmative answer would have been inconsistent with a general verdict in Smart's favor.

¶ 31    Section 2-1108 of the Illinois Code of Civil Procedure governs special interrogatories and states:

> "Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2-1108 (West 2006).

¶ 32    A special interrogatory is in proper form if "(1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned." *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002). A special interrogatory's response is inconsistent with a general verdict only where it is "clearly and

absolutely irreconcilable with the general verdict." (Internal quotation marks omitted.) *Id.* at 555-56. The purpose of a special interrogatory is not to instruct the jury, but to serve as a check on the jury's deliberation and to enable the jury to determine one or more specific issues of ultimate fact. *Id.* at 555; *Santos v. Chicago Transit Authority*, 198 Ill. App. 3d 866, 869 (1990). Additionally, a special interrogatory: (1) should consist of a single direct question; (2) should not be prejudicial, repetitive, misleading, confusing or ambiguous; and (3) should use the same language or terms as the tendered instructions. *Simmons*, 198 Ill. 2d at 563; *Santos*, 198 Ill. App. 3d at 870; *Ewanic v. Pepper Construction Co.,* 305 Ill. App. 3d 564, 568 (1999)**.** We review a trial court's ruling regarding a request for a special interrogatory *de novo. Garcia v. Seneca Nursing Home*, 2011 IL App (1st) 103085, ¶ 35.

¶ 33 We first consider whether the special interrogatory would have tested the general verdict. A special interrogatory is not in proper form unless it would be inconsistent with some general verdict that the jury may return on the issues in the case. *Van Hattem v. K mart Corp.*, 308 Ill. App. 3d 121, 132 (1999). In this case, the special interrogatory asked: "Was the contributory negligence of Todd Smart, if any, greater than 50% of the proximate cause of his injuries?" Because the jury returned verdict form A, we limit our consideration to that verdict form only in determining whether the special interrogatory properly tested the general verdict.

¶ 34 Verdict form A states: "We, the jury, find for the plaintiff, Todd Smart, and against defendant, The City of Chicago." See Illinois Pattern Jury Instructions, Civil, No. B45.01A (2006). We agree with the City that an affirmative answer to the special interrogatory would clearly be inconsistent with this verdict form finding in favor of Smart. More specifically, an

11

affirmative answer to the special interrogatory would establish that Smart was greater than 50% contributorily negligent in causing his injuries, which would directly contradict the jury returning a general verdict in Smart's favor. Consequently, the City's special interrogatory would have sufficiently tested the jury's verdict in favor of Smart.

¶ 35    We next address whether the City's special interrogatory asked a single, direct question. Smart claims that the interrogatory consisted of multiple questions: (1) whether Smart was contributorily negligent; (2) if so, whether Smart's negligence proximately cause his injuries; and (3) if so, whether Smart's contributory negligence exceed 50% of the total negligence contributing to his injuries. Smart contends that these multiple questions render the interrogatory impermissibly compound.

¶ 36    The City relies on *Garcia v. Seneca Nursing Home*, 2011 IL App (1st) 103085, in support of its argument that the special interrogatory was in proper form. The special interrogatory this court found proper in *Garcia* read: " 'Prior to Roberto Garcia's death, was it reasonably foreseeable to [defendant] that he would commit suicide or act in a self-destructive manner on or before April 21, 2004?' " *Id.* ¶ 10. The plaintiff in *Garcia* claimed that the interrogatory was not in proper form because the jury was required to make the following four factual findings: whether "(1) Roberto committed suicide, and (2) if so, was it foreseeable, or (3) whether Roberto committed a self-destructive act, and (4) if so, was it foreseeable?" *Id.* ¶ 51. This court disagreed, finding that the question was properly phrased as a single question regarding the foreseeability of two alternatives in the disjunctive and that an affirmative answer to either alternative required an affirmative answer to the entire interrogatory. *Id.* Thus, this court

concluded that the special interrogatory's construction was not impermissibly compound. *Id.*

¶ 37   The special interrogatory in *Garcia* is distinguishable from the one propounded by the City in this case.  In *Garcia*, the interrogatory asked a single question regarding foreseeability. The issue was whether the likelihood that Roberto would injure himself, whether by suicide or a self-destructive act, was foreseeable by defendant.  In contrast, the special interrogatory in this case, although deceptively brief, asks whether Smart was contributorily negligent, and if so, whether his negligence was the proximate cause of his injuries and, if so, whether the negligence attributable to Smart was greater than 50%.  We agree with Smart that the City's special interrogatory is impermissibly compound because it would have required the jury to consider multiple questions relating to the cause of Smart's injuries.  The form of the special interrogatory was in direct contradiction to the established rule that a special interrogatory must be phrased as a single, straightforward question.  *Ahmed*, 385 Ill. App. 3d at 889.

¶ 38   The special interrogatory was also not in proper form because its language was prejudicial to Smart.  The opening phrase, "Was the contributory negligence of Todd Smart," presumes that the jury has found that Smart was contributorily negligent without directly asking the jury to make that finding.  Indeed, the City could properly have tendered an interrogatory that asked, "Do you find that Todd Smart was contributorily negligent?"  See *Santos*, 198 Ill. App. 3d at 868, 870 (proper for special interrogatories to ask " 'Was there contributory negligence on the part of John Santos immediately before and at the time of his injuries?' " and " 'Was there contributory negligence on the part of the plaintiff before and at the time of the occurrence which was the sole proximate cause of his injuries?' ").

¶ 39     The City contends that any prejudicial effect was cured by its insertion of the dependent clause "if any" immediately following the introductory phrase. The City relies on *Johnson v. Owens-Corning Fiberglass Corp.*, 313 Ill. App. 3d 230 (2000), to establish that use of a dependent clause in a special interrogatory is permissible. The City's reliance on *Johnson* is misplaced. The special interrogatory in *Johnson* stated: " 'Do you find that Charles Johnson's lung cancer was caused, in whole or in part, by exposure to fibers from A.P. Green [APG] asbestos products used at Keystone?' " *Id.* at 236. After considering the special interrogatory along with the other instructions, this court concluded that the special interrogatory was in proper form. *Id.* at 237. This court reasoned that a rational jury would understand that exposure to APG's product need not be the sole cause of Johnson's lung cancer to answer the interrogatory in the affirmative. *Id.* The opinion, however, did not specifically analyze whether the use of a dependent clause in a special interrogatory automatically renders the interrogatory proper in form or explicitly address whether the interrogatory was impermissibly compound. Thus, *Johnson* is not dispositive of the issue here.

¶ 40     Although the dependent clause, "if any," did allow for the possibility that Smart was not contributorily negligent, the addition of that clause did not eliminate the prejudicial effect of the introductory clause, which presumes that finding. On this point, Smart relies on *Lundquist v. Nickels*, 238 Ill. App. 3d 410 (1992), and we find that case instructive. The special interrogatory in *Lundquist* asked: " 'Was the plaintiff Margaret Lundquist's negligence the sole proximate cause of her injuries?' " *Id.* at 434. This court found that interrogatory misleading and concluded that the trial court properly refused to give it. *Id.* This court reasoned that the special

interrogatory inappropriately *assumed* that the jury found the plaintiff comparatively negligent rather than *asking* the jury if it found the plaintiff comparatively negligent. *Id.* at 435. Similarly, here, the City's special interrogatory assumed that Smart was contributorily negligent and did not initially ask the jury to independently determine that fact. Inclusion of the dependent clause "if any" did not temper the prejudicial impact of the introductory language that presupposed a finding the jury was not asked to make.

¶ 41    In sum, the City's special interrogatory asked a question that was impermissibly compound and its introductory language was prejudicial to Smart. For these reasons, we conclude that the trial court did not err in refusing to submit the City's special interrogatory to the jury and a new trial is not warranted.

¶ 42                                B. Jury Instructions

¶ 43    Smart again claims that the City has forfeited review of its claim that the trial court erroneously rejected its proffered premises liability jury instruction. Smart contends that the City did not object to IPI Civil (2006) No. 120.02, the comments to which indicate that it should be accompanied by general negligence instructions. Smart, however, acknowledges that the City objected to the trial court's refusal of its tendered IPI Civil (2006) No. 120.08. The record reveals an extensive colloquy during the jury instructions conference regarding the appropriate issues instruction. The City opposed the trial court's interpretation of the relevant notes on use to IPI Civil (2006) No. 120.02 and IPI Civil (2006) No. 120.08 and claimed that a premises liability issues instruction should have been given because Smart's allegations related to the condition of the street and not to any "activity" or "business" conducted thereon. Because the City raised the

trial court's alleged error in refusing to tender its proffered instruction and included that point in its posttrial motion, it has preserved the issue for appeal. *Thorton*, 237 Ill. 2d at 106.

¶ 44    Before addressing the merits of the City's claim, we note that the parties disagree on the applicable standard of review. The City asserts that *de novo* review applies because the trial court tendered the wrong jury instruction, which requires this court to address a legal question. The City predicates its argument that the *de novo* standard of review applies on its contention that, as a matter of law, Smart's claim was a premises liability claim and, therefore, the trial court was obligated to give the premises liability issues and burden of proof instruction.

¶ 45    As we discuss below, Smart pursued a negligence claim against the City and he was entitled to elect the legal theory upon which to proceed. We agree with Smart that the City's claim is that the trial court erred in refusing to tender its proffered jury instruction. Because it is within the trial court's discretion to give or deny a jury instruction, we employ an abuse of discretion standard of review. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002). An abuse of discretion standard requires this court to determine whether the instructions, taken as a whole, are sufficiently clear so as not to mislead they jury and whether they fairly and correctly state the law. *Id.*[1]

¶ 46    The City asserts that the trial court erred in instructing the jury with the burden of proof instruction for use in general negligence cases (IPI Civil (2006) No. 20.01) instead of the premises liability issues and burden of proof instruction (IPI Civil (2006) No. 120.08). The City claims that tendering the general negligence instruction was prejudicial because it relieved Smart

---

[1]  We note, however, that no matter what standard of review is applied, we would find no error in the trial court's refusal of IPI Civil (2006) No. 120.08.

of the burden of proving all of the elements necessary to impose liability on a landowner for an unreasonably dangerous condition on the landowner's property. As noted above, IPI Civil (2006) No. 120.08 requires a premises liability plaintiff to prove, among other things, that the landowner knew or in the exercise of ordinary care should have known of both the condition and the risk the condition posed to others lawfully on the property. The City also claims that the premises liability instruction should have been tendered because Smart's claim for recovery was based on the public street's unsafe condition and not on any activity that the City was conducting at the time Smart was injured. Finally, the City contends that the jury was likely confused by the trial court's tendering of two duty instructions, which included the City's duty as the owner of land (IPI Civil (2006) No. 120.02) and its duty under ordinary negligence principles (Illinois Pattern Jury Instruction, Civil, No. 10.04 (2006)).

¶ 47 The fundamental premise underlying the City's argument on this issue is that Smart pursued "a standard premises liability case against the City." Clearly he did not. Smart's one-count complaint sounded in negligence, not premises liability. Thus, in arguing that the trial court erred in refusing the issues and burden of proof instruction applicable in premises liability cases, the City simply misses the mark.

¶ 48 As we have recited above, the trial court instructed the jury, pursuant to IPI Civil (2006) No. 120.02, that the City, as a property owner, was under a duty to exercise ordinary care to see that its property was reasonably safe for use by those lawfully on the property. This is indisputably an accurate statement of the law. See *Washington v. City of Chicago*, 188 Ill. 2d 235, 239 (1999); *Warning v. City of Joliet,* 2012 IL App (3d) 110309, ¶ 27; *Jefferson v. City of*

17

*Chicago,* 269 Ill. App. 3d 672, 677 (1995). However, the use of this instruction did not transform this case into a premises liability case. Owners of property, whether sued for negligence or premises liability, owe the duty to those lawfully on the property articulated in IPI Civil (2006) No. 120.02. Consequently, the trial court's decision to give IPI Civil (2006) No. 120.02 did not automatically entitle the City to require that IPI Civil (2006) No. 120.08 be given as well.

¶ 49    As also noted previously, the comments to IPI Civil (2006) No. 120.02 direct that if the plaintiff is alleging that an activity conducted on the property by the landowner caused plaintiff's injury, the relevant negligence instructions should also be used. The Notes on Use to IPI Civil (2006) No. 120.08 likewise direct the use of negligence instructions:

"Use this instruction for premises liability cases, including those in which the plaintiff claims that he/she was distracted and failed to observe an open and obvious defect on the property. *** *If the action alleges that an activity on the premises caused the injury* or that the dangerous condition arose as part of the defendant's business, *use IPI 20.01 and IPI B10.03*." (Emphasis added.) IPI Civil (2006) No. 120.08, Notes on Use.

¶ 50    The City contends that because it was not engaged in any "activity" on the date Smart was injured, it cannot be said that any activity conducted on the premises proximately caused Smart's injuries and, therefore, Smart and the trial court misread IPI Civil (2006) No. 120.02's direction to use negligence instructions. We disagree. The City's activity in resurfacing the intersection, a project that was ongoing as of July 1, 2007, and which altered the otherwise safe bicycle path, resulted in raised structures in the roadway and a shallow trench or gash not readily visible. The

alteration of the bicycle path as a result of these activities was clearly the proximate cause of Smart's injuries.

¶ 51    *Moore v. Chicago Park District*, 2012 IL 112788, heavily relied upon by the City in connection with its premises liability argument, is not on point. In *Moore,* the plaintiff brought a negligence claim asserting that the park district's activities in negligently and carelessly shoveling and plowing snow into mounds on its parking lot and walkway created an unnatural condition for pedestrians to walk upon or step over. *Id.* ¶ 4. The *Moore* court addressed the scope of the Chicago park district's immunity under section 3-106 of the Act (745 ILCS 10/3-106 (West 2008)). *Moore*, 2012 IL 112788, ¶ 9. The certified question presented in *Moore* was whether an accumulation of snow and ice on park district property caused by plowing and shoveling activities was a "condition" of the property within the meaning of section 3-106, which immunizes public bodies from liability for injuries where the liability is based on "the existence of a condition of any public property" used for recreational purposes, unless the public body is guilty of willful and wanton conduct proximately causing the injury. *Id.* ¶¶ 1, 9. In *Moore*, our supreme court ultimately concluded that the existence of snow and ice on park district recreational property was not an "activity" conducted on defendant's property, but rather a "condition of the property." *Id.* ¶ 16. Thus, the court found that the park district was immune under the Act.

¶ 52    In this case, any arguments raised by the City under the Act were resolved prior to trial and no issues regarding the City's immunity from suit are raised on appeal. Furthermore, the liability of the City here is not based on section 3-106 of the Act, but rather on the general duty

imposed on a public entity under section 3-102 (a) "to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property." 745 ILCS 10/3-102(a) (West 2006). *Moore*'s construction of the word "condition" as used in section 3-106 of the Act has no relevance in this case where liability against the City is based, even under the City's view, on common law principles regarding a landowner's duty toward those lawfully on the land. This case also does not involve injuries sustained on property used for recreational purposes and, therefore, the supreme court's reasoning regarding what activities by a public body will remove a case from the scope of immunity afforded under section 3-106 of the Act for such claims does not apply.

¶ 53    But even if *Moore*'s reasoning was applied in the context of this case, the result would be the same. In *Moore*, a park district employee shoveled or plowed ice and snow that had fallen on recreational property. *Moore*, 2012 IL 112788*,* ¶ 3. In that context, the supreme court reasoned that snow was a naturally occurring substance when it fell on the property and did not become an "activity" when it was shoveled or plowed but, rather, remained a condition of the property. *Id.* ¶ 16. Here, in contrast, the City's activities in removing the surface of the street, milling the street in multiple directions, leaving exposed structures above the milled surface, and creating a trench into which Smart's front wheel lodged cannot fairly be characterized as anything other than "activities." Through these activities, the City altered the safe condition of the street and rendered it unsafe for persons, including Smart, entitled to use it.

¶ 54    Relevant authority involving cases against landowners for injuries sustained on property also does not support the City's contention that a landowner must be contemporaneously

20

performing some activity at the time a plaintiff is injured in order for negligence rather than premises liability principles to apply. See *Reed v. Wal-Mart Stores*, *Inc.*, 298 Ill. App. 3d 712, 717-18 (1998) (plaintiff entitled to ordinary negligence instruction where plaintiff's complaint alleged that the negligence of defendant's employees in placing a board with rusty nails protruding in a pathway used by customers caused the injuries she sustained when she stepped on the board.) In fact, *Reed* recognizes that under circumstances where a landowner's conduct in creating an unsafe condition precedes the plaintiff's injury, a plaintiff may elect to pursue a negligence claim, a premises liability claim, or both. *Id.* at 717. "[P]laintiffs are masters of their complaint and are entitled to proceed under whichever theory they decide, so long as the evidence supports such a theory." *Id.* at 718. See also *Wind v. Hy-Vee Food Stores, Inc.*, 272 Ill. App. 3d 149, 156 (1995) (plaintiff permitted to pursue negligence claim when she tripped over the curled edge of a mat placed earlier by defendant's employee at the front door of defendant's store; plaintiff claimed it was standard practice for the edges of mats to be taped down and that defendant was negligent in failing to tape the mat that caused her to trip). Therefore, notwithstanding the "legions of cases" the City claims apply premises liability principles to injuries arising from the condition of property, the City could not require Smart to pursue a theory of liability he chose not to plead.

¶ 55    Indeed, under the circumstances of this case, it would have been error to give IPI Civil (2006) No. 120.08, which required Smart to affirmatively prove, as an element of a premises liability claim, that the City had notice of the condition that posed an unreasonable risk of harm. Here it is uncontroverted that the City's conduct created the hazard that caused Smart's injuries.

Given that fact, Smart was not required to show that the City had notice of the hazard. See

Illinois Pattern Jury Instructions, Civil, No. 120.00, Introduction (2006) ("Case law departs from

the 'notice' requirement *** when the plaintiff shows, through direct or circumstantial evidence,

that the dangerous condition arose from the defendant's acts ***.").[2]

¶ 56    We also reject the City's claim that the failure to give IPI Civil (2006) No. 120.08 was

prejudicial because that instruction would have required Smart to prove that the hazardous

conditions in the street were not open and obvious. First, IPI Civil (2006) No. 120.08 imposes

no such burden on a premises liability plaintiff. IPI Civil (2006) No. 120.08 requires the plaintiff

in a premises liability case to prove that the condition on the property presented "an unreasonable

risk of harm." A claim that the unreasonably dangerous condition of property proved by the

plaintiff was open and obvious is a defense to a premises liability claim. See *Choate v. Indiana*

*Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 34 (and cases cited therein) (recognizing that the

"known or obvious risk" principle negates the existence of a duty owed to plaintiff and is a

matter relating to plaintiff's contributory negligence or the parties' comparative fault). Second, as

the proponent of that defense, the City would have borne the burden to plead and prove it. In the

event that Smart elected to pursue a premises liability claim, he would not have been required to

prove a negative, *i.e.*, that the hazardous conditions of the street were *not* open and obvious.

Finally, under the circumstances of this case, the City does not explain how a jury could have

found that the hazardous conditions of the intersection were open and obvious when the City's

_____

[2] Although Smart and the trial court also relied upon the theory that the City was in the "business" of resurfacing a street, which is another circumstance that warrants the giving of ordinary negligence instructions under the comments to IPI Civil (2006) No. 120.08, we need not reach that issue given our conclusions regarding the City's activity at the site.

only witness testified that the street was perfectly level and that the gash or shallow trench was merely a "concrete shadow."

¶ 57    In sum, the City was in the process of resurfacing the intersection where the accident occurred, a project that was ongoing on the day of the accident, and it was directly responsible for completing and overseeing the resurfacing activities.  The City's resurfacing activities created the unsafe conditions that caused Smart's injuries.  The trial court properly adhered to the guidance dictated by the Notes on Use for IPI Civil (2006) No. 120.02 and IPI Civil (2006) No. 120.08 and did not err in tendering duty and burden of proof instructions applicable to general negligence cases.  Moreover, Smart chose to pursue a negligence claim against the City and the jury was properly instructed based on that cause of action.  Because the trial court did not err in refusing to tender the City's proffered premises liability instruction, a new trial is not warranted.[3]

¶ 58                                    CONCLUSION

¶ 59    Accordingly, we affirm the judgment of the trial court.

¶ 60    Affirmed.

---

[3] We need not address the City's final contention regarding evidence admissible on retrial given our affirmance of the jury's verdict.

23