2018 IL App (1st) 160322

FOURTH DIVISION
June 28, 2018

Nos. 1-16-0322, 1-16-1380 and 1-16-1496 (Consolidated)

| | | |
|---|---|---|
| THOMAS NEUHENGEN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee and Cross-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| GLOBAL EXPERIENCE SPECIALISTS, INC., a | ) | |
| Nevada Corporation, and FREDERICK NEIRINCKX, | ) | |
| | ) | No. 12 L 11854 |
| Defendants-Appellants, | ) | |
| | ) | |
| (Global Experience Specialists, Inc., a Nevada Corporation,) | | |
| | ) | Honorable |
| Cross-Appellee). | ) | Lorna E. Propes, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Gordon and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Thomas Neuhengen was working at a trade show at McCormick Place in Chicago when he was injured by a forklift driven by defendant Frederick Neirinckx, an employee of defendant Global Experience Specialists, Inc. (GES). Plaintiff filed a complaint alleging negligence and willful and wanton conduct against GES and Neirinckx. Prior to the jury trial, Neirinckx admitted his negligence, and GES admitted negligence under the *respondeat superior* doctrine. GES further admitted that if Neirinckx's conduct was found to be willful and wanton, then it admitted its *respondeat superior* liability for Neirinckx's conduct. Following the trial, the jury awarded plaintiff $12,228,068 in compensatory damages on the negligence claims and $3,000,000 in punitive damages after finding GES's conduct to be willful and wanton in a

special interrogatory. The jury found that Neirinckx's conduct was not willful and wanton in a special interrogatory.

¶ 2 Defendants filed a posttrial motion raising multiple claims, including a motion for a new trial and a request for judgment notwithstanding the verdict (JNOV) on the $3,000,000 punitive damages award against GES. The trial court granted defendants' motion for a JNOV on the punitive damages award, finding that plaintiff failed to prove GES's willful and wanton conduct proximately caused plaintiff's injury. Plaintiff filed a motion to reconsider the trial court's grant of JNOV, which was denied.

¶ 3 Defendants appealed and plaintiff filed a cross-appeal. In their appeal, defendants argue that the trial court abused its discretion in denying their motion for a new trial because they were deprived of a fair trial when the trial court failed to dismiss the count against GES alleging willful and wanton conduct after GES admitted its *respondeat superior* liability for Neirinckx's conduct. In his cross-appeal, plaintiff contends that the trial court erred in granting defendants' motion for a JNOV on the jury's verdict that GES's conduct was willful and wanton and striking the punitive damages award.

¶ 4 In September 2012, GES served as an official services contractor for the 2012 International Manufacturing Technology Show (IMTS) at McCormick Place. IMTS involved three phases: the "move-in" phase, when all large equipment for exhibition was brought in; the show itself for exhibitors and guests; and the "move-out" phase, when workers removed the heavy equipment exhibited at the show. GES hired Neirinckx as one of its forklift operators for IMTS.

¶ 5 On September 18, 2012, plaintiff was at IMTS during the move-out phase for his employer, the Hermle Corporation (Hermle), an exhibitor at the show. Plaintiff was in the

Hermle exhibitor booth when Neirinckx was operating a 58,000-pound Versa Lift 40/60 forklift (Versa Lift) to remove equipment. Neirinckx was working with Christopher Nash, another GES employee, as his spotter. While attempting to pick up a piece of Hermle's equipment, Neirinckx operated the Versa Lift and came into contact with plaintiff's left foot and ankle causing severe injuries. Nash was removing debris from the floor and was not acting as Neirinckx's spotter at the time of the accident.

¶ 6    In January 2015, plaintiff filed a motion to amend his complaint to add separate punitive damages claims against Neirinckx and GES which was granted in April 2015. The operative complaint when the parties were proceeding to trial was plaintiff's fourth amended complaint. Count I alleged negligence against GES under the doctrine of *respondeat superior* for Neirinckx's actions. Count II alleged direct negligence against GES based on negligent hiring and training of Neirinckx. Count III alleged willful and wanton conduct by GES based on Neirinckx's conduct as well as GES's conduct in hiring and training. Count IV alleged negligence against Neirinckx in the operation of the Versa Lift, while count V alleged willful and wanton conduct against Neirinckx in the operation of the Versa Lift.

¶ 7    In August 2015, prior to jury selection, defendants admitted Neirinckx's negligence and that GES was liable under the doctrine of *respondeat superior*. GES also admitted *respondeat superior* for any willful and wanton conduct by Neirinckx if the jury should find against him. GES then moved to dismiss counts II and III from the fourth amended complaint, arguing that the claim of negligent hiring and reckless hiring based on willful and wanton conduct were "duplicative" in light of its admission of *respondeat superior* liability which eliminated "all corporate misconduct claims in this case." After arguments, the trial court granted GES's motion

3

to dismiss count II, the claim of negligent hiring directed against GES, but denied the motion as to count III, the claim of willful and wanton conduct based on GES's reckless hiring.

¶ 8    During the trial, the circuit judge instructed plaintiff to file a new complaint to correspond with the claims being presented to the jury. Plaintiff's fifth amended complaint alleged negligence against both Neirinckx and GES based on Neirinckx's actions in count I, alleged willful and wanton conduct against Neirinckx in count II, and alleged willful and wanton conduct against GES in count III. The willful and wanton allegations in count III were against GES based upon Neirinckx's conduct as well as GES's own conduct for failing to have a three person crew, failing to implement a procedure to check certifications of forklift operators, and failing to ensure that Neirinckx was trained in the operation of the Versa Lift.

¶ 9    The following evidence was presented at trial.

¶ 10    Plaintiff was 35 years old at the time of the trial, served in the Wisconsin Army National Guard, and had served two deployments to Iraq. He was employed by Hermle at the time of the accident and was present during the move-out phase of IMTS.

¶ 11    On September 18, 2012, he arrived at McCormick Place between 7 and 7:30 a.m. He was working with Richard Saegert. Plaintiff observed that some of Hermle's machines had already been loaded onto a truck when he arrived. He noticed Neirinckx moving one of Hermle's "C22 machines," and "he was backing up with it over a bunch of crates." Plaintiff went over to Neirinckx and confirmed that the machine was being taken to the correct truck to move Hermle's equipment back to Wisconsin. He also asked Neirinckx to next move the "C22 accessory skid," which is where all the components for that machine were placed, to keep the items together.

¶ 12    Plaintiff and Saegert moved closer to the accessory skid. Plaintiff noticed Neirinckx "was pushing" one of Hermle's coolant pans with the forks of his forklift. Plaintiff asked Neirinckx to

4

stop while he got another "fork truck" to move the coolant pan out of Neirinckx's way. Neirinckx backed up and stopped. Plaintiff asked another person, John Lopez, to come over to move the coolant pan. While plaintiff stepped away to get Lopez to assist, he heard Saegert say, "Stop." Plaintiff turned around and saw Neirinckx moving the forklift. He heard Saegert tell Neirinckx to wait until the debris was moved out of the way. Neirinckx then stopped.

¶ 13    While in the process of moving the coolant pan with the smaller forklift, the coolant pan snagged on an extension cord and slipped slightly off the forks, "teetering" approximately a foot off the ground. Plaintiff and Saegert bent down to pick up the pan and slipped it back onto the forks. Plaintiff believed he was in a crouch position for a couple of seconds, then stepped away so Lopez could back up with the pan.

¶ 14    As Lopez was backing up with the coolant pan, plaintiff felt something bump him from behind and he fell to the ground. At that point, the rear wheel of the forklift operated by Neirinckx "caught" his left heel and "then pulled off on [his] foot." Plaintiff testified that the forks of the forklift were ten feet behind him. Plaintiff was in front and a little to the right of Neirinckx's forklift.

¶ 15    Plaintiff testified that the cab to the Versa Lift forklift is to the left as one is seated in it, which left a blind spot to the right. Plaintiff did not receive any warning that he would be struck. He was unable to hear the forklift because there were a number of vehicles moving around the space. He did not hear a horn nor did anyone communicate with him that the Versa Lift was going to move. Plaintiff's safety training had taught him that you should not turn your back to a moving fork lift. If he had turned to face Neirinckx's forklift, then plaintiff's back would have been to Lopez who was operating the smaller forklift.

¶ 16    At that point, plaintiff could not feel anything in his foot, but then the "sudden waves of pain" started. He described the pain as "like someone just took a sledgehammer and started pounding on [his] foot." Evidence regarding the extent of plaintiff's injuries is discussed later in this opinion.

¶ 17    Richard Saegert was employed by Hermle and he was working with plaintiff during the move-out phase of IMTS when plaintiff was injured. He first observed Neirinckx operating the forklift when he was moving the coolant pan. He heard plaintiff tell Neirinckx to stop, and Neirinckx moved backwards approximately one foot and stopped. Saegert then tried to move the coolant pan with plaintiff, but they were unsuccessful. Plaintiff went to get a smaller forklift. Another employee, John Lopez, was attempting to lift the coolant pan with the smaller forklift when it got "snagged" on an extension cord. Plaintiff and Saegert "used [their feet] to lift it back on the forklift to relocate it."

¶ 18    Next, Neirinckx started to move approximately a foot closer and Saegert told him to stop, which he did. The accident happened shortly thereafter. Saegert did not receive any warning from Neirinckx that he was going to move and did not hear a horn. Saegert did not see a spotter with Neirinckx. Saegert denied that he or plaintiff bent over or got down on a knee. He testified that neither he nor plaintiff left the area of the coolant pan.

¶ 19    When plaintiff was struck, he started to fall and Saegert caught him and heard an "awful scream." Saegert told Neirinckx to get off the forklift, which he did. Neirinckx turned off the forklift, got off, did not say anything, and walked away.

¶ 20    Frederick Neirinckx testified that he began operating forklifts in the 1960s. In 2012, he had been "semiretired' for about 8 to 10 years. He worked every other year at a couple shows. The Versa Lift had been around about 10 years prior to the accident. The Versa Lift weighed

about 58,000 pounds. When sitting in the cab of the forklift, there is a blind spot. He estimated that to the right, the operator cannot see the floor until 10 to 12 feet away from the forklift. Neirinckx had operated them "ever since they came out," but he did not receive any specific training for that forklift, nor had he received any training since some time in the 1990s.

¶ 21    He was hired by Larry Gibas from GES for the IMTS convention in 2012. Gibas had previously hired him in 2010 and 2008. Gibas never asked for certification from Neirinckx. No one informed him that the Occupational Safety and Health Administration (OSHA) had a certification requirement. He was never taught not to move the Versa Lift without a spotter. He was not taught to communicate with people around the area before moving the forklift.

¶ 22    On September 18, 2012, Neirinckx arrived at McCormick Place between 6:30 a.m. and 6:45 a.m. He moved a machine to a truck before the accident. He returned to the Hermle booth and plaintiff told him to take the accessory skid and to place it in the truck next to the previously loaded machine. To get to the accessory skid, he had to go around a machine, but there was a coolant pan on the floor. He pushed the coolant pan with the forks of the Versa Lift. Plaintiff asked him to stop pushing the pan. Neirinckx backed up to a neutral position to get around the machine and then he stopped. He observed debris in front of the accessory skid and asked his spotter, Christopher Nash, to move it, which Nash did. Neirinckx testified that plaintiff was off to the right of the forklift.

¶ 23    Neirinckx looked to see if Nash had finished clearing debris, but Nash was still clearing items and his back was to the forklift. Neirinckx was going to line up with the accessory skid. He testified that he looked to his right and no longer saw plaintiff in the spot where he had seen him. He did not see Saegert either. He did not wait for his spotter before moving the forklift. He did not sound the horn or tell anyone that he was going to move the forklift.

¶ 24    Neirinckx moved the forklift to his left to point toward the accessory skid. He then heard someone yelling for him to stop, but he did not know who it was. He had completed approximately 90% of the turn. He did not hear plaintiff scream. He put on the brake and got out of the forklift. He saw plaintiff on the floor and realized he hit plaintiff with the right tire. He testified that he had assumed plaintiff had moved, but he never saw him leave.

¶ 25    Neirinckx took a drug test after the accident, which he passed. He continued to operate the forklift that day and the following day. He testified that after the accident, someone from GES asked to see his certification and he told them he did not have one. He was not told that he needed to be retrained under OSHA regulations. After the show, he received a certified letter stating that GES had suspended him.

¶ 26    Christopher Nash testified that he was hired as part of a two-man crew at IMTS 2012. He worked as a forklift operator. His other crew member was Neirinckx. Neirinckx was the foreman of their crew and Nash was the journeyman. The journeyman takes direction from the foreman. Nash was a member of the Local 136 union and was trained in the operation of forklifts, including the Versa Lift. He was assigned to IMTS through the union. When he checked in on the site, no one from GES asked to see his certification card.

¶ 27    On September 18, 2012, Nash arrived between 6:30 and 7 a.m., but his start time was 8 a.m. He observed Neirinckx working before 8 a.m. without a spotter. Nash described the spotter's role as looking out for hazards, clearing the right of way, and making sure everyone is out of the direction of travel. He and Neirinckx were assigned to plaintiff's booth. They were to "pick a skid" and clear debris. He was moving "stuff" out of the way before the forklift could turn to reach the accessory skid. His back was to the area where the coolant pan was located.

¶ 28    As he was clearing debris, he heard the engine of the forklift turn on. He testified that he tried to hurry and finish getting the "stuff" out of the way. His back was to the Versa Lift. The next thing he heard were screams. He turned and saw Neirinckx driving toward him. Nash estimated that 30 to 60 seconds passed from when he heard the forklift turn on until he heard the scream. Neirinckx did not notify him or sound the horn indicating he was going to move the forklift. Nash expected that Neirinckx was going to wait for Nash to spot for him. When Neirinckx moved the forklift, the accessory skid was not accessible because Nash had not finished clearing debris. Nash was able to get Neirinckx's attention to stop the forklift only after Nash heard the scream. Nash then walked to the back of the machine to see who was screaming and observed plaintiff "laying on the floor in pure agony yelling and screaming."

¶ 29    From what Nash could tell, the back right tire drove over plaintiff's foot. He described the Versa Lift as "rear heavy." Nash also took a drug test after the accident, which he passed. He then returned to work. He testified that OSHA required people to be retrained after an incident. They resumed use of the same forklift, but Nash operated it. Neirinckx operated the Versa Lift over the next few days. At the time of the accident, Neirinckx did not have a spotter. Nash testified that Neirinckx had operated before without a spotter. Nash told Mike Burns, the GES general foreman at IMTS in 2012, that Neirinckx "was a little bit unsafe, that [Nash] was a little weary [*sic*] of working with him."

¶ 30    Nash believed that the Versa Lift needed a three person crew, one spotter for either side, because "the mass is so big you can barely see what's in front of you so you have to have someone in front of you, telling you what to do and most likely you would want the guy on the right-hand side because that's the side you can't see." Nash testified that if Neirinckx had waited until he was acting as the spotter, Nash would have cleared Neirinckx's travel, told people to get

out of the way, made sure Neirinckx was going in the right direction, and made sure everything was out of the way.

¶ 31    John Lopez testified that he was employed as a rigger, a member of Local 136, and was working IMTS in 2012. He was hired by Larry Gibas from GES. On September 18, 2012, Lopez was operating a small forklift and was asked to move a coolant pan by plaintiff at the Hermle booth. He slid his forks under the pan, but the pan slid off the forklift because of an extension cord. He was not paying attention to Neirinckx; he was paying attention to his "pick." When the pan slid off the forklift, plaintiff and his coworker helped to slide it back onto the forks. Lopez testified that plaintiff "crouched down" to push the pan. Lopez was "pretty sure" but "not 100 percent sure" that plaintiff got on one knee with one foot stretched behind him. Lopez believed that plaintiff was in that position when he was struck by the Versa Lift. He testified that the Versa Lift would not have hit plaintiff "if he hadn't had his leg out."

¶ 32    Lopez was trained and certified to operate the Versa Lift. He had also worked as a spotter. He did not have a spotter for his forklift because it was small and he could see all around the machine. Lopez was preparing to back up with the pan on his forklift when the accident occurred. Lopez testified that he had turned around "real fast" to check if he could back up when the accident happened. He agreed that he might not have seen plaintiff stand up. Lopez agreed "100 percent" that plaintiff did not do anything unsafe.

¶ 33    Dan O'Donnell was employed as the apprentice coordinator for Local 136, the only rigging union in the country. A "rigger" is a person with a specialty in moving large items, including machinery. The union did not have a forklift certification until the mid 1990s. He trains forklift operators to be OSHA certified. OSHA requires certification every three years. Local 136 "will not dispatch anybody unless they are certified on that machine."

¶ 34    O'Donnell testified that he knows Neirinckx, who is a member of Local 136. He thought Neirinckx had retired. He has not observed Neirinckx at any of the safety classes, nor has he ever evaluated Neirinckx. According to O'Donnell, no one can be "grandfathered" into training because the person has been operating a machine for a long time. He noted that the Versa Lift is "notorious for certain blind spots, dead behind it, to the right if it's just forks. The actual whole front end has a boom on it. You cannot see anything."

¶ 35    Training sessions were offered prior to IMTS in 2012. Under the collective bargaining agreement, GES had the right to pick up to 50% of the riggers, while Local 136 would dispatch the rest. Neirinckx was a member of Local 136 at the time of IMTS but was not dispatched by it; he was hired by GES. He was aware of the OSHA rule requiring people in an accident to be retrained. He was not present at IMTS in 2012 when the accident occurred.

¶ 36    Cedric Johnson testified that during IMTS in 2012, he was the senior safety manager of the East for GES and he was at IMTS during the show. He was aware that OSHA regulations required forklift operators to be certified, which included training and an evaluation for competency. An individual has to be recertified every three years.

¶ 37    He testified that at IMTS in 2012, operations should have been checking for certification cards. He does not know if operations fulfilled that obligation. If no one checked certification, then it was a violation of safety rules and policies. Johnson was at McCormick Place at the time of the accident but did not witness it. He went to the scene shortly thereafter. He was aware of the OSHA regulation that Neirinckx needed to be retrained following the accident. He took Neirinckx for the drug test after the accident. During that time, Johnson did not ask to see Neirinckx's certification nor did he discuss retraining with him. He agreed that Neirinckx should not have returned to work. Johnson also agreed that Neirinckx should have been certified.

¶ 38 Pete Carroll testified that he was the general manager of the central division for GES. Carroll had himself taken a performance test, received training on operating a forklift, and maintained his certification. He agreed GES had responsibility for ensuring all on-site employees, including Neirinckx, were trained to operate forklifts. He was also aware that employees had to be retrained after an incident and that employees have to be recertified every three years, regardless of the employee's experience. He agreed that, when there is pedestrian traffic nearby, the operator of a Versa Lift should not move the forklift unless he had a spotter on the ground to assist and to guide and the operator must receive direction from his spotter before moving.

¶ 39 Carroll admitted that Neirinckx was not certified when operating a forklift at IMTS in 2012. He agreed that GES violated that safety rule and Neirinckx should not have been hired based on his lack of certification. Carroll further admitted that GES did not have a process in place to check certification at IMTS in 2012. He testified that they "relied on Local 136 to provide certified forklift operators per [their] collective bargaining agreement." He admitted that he had no way of knowing if the GES direct hires were certified, but Local 136 notified him that the operators dispatched from the union were certified. He agreed that Neirinckx was a direct hire. He also agreed that it was the employer's responsibility to maintain certification under OSHA regulations. Carroll testified that the operations manager in the hall where Neirinckx was assigned should have had a process in place to check certification.

¶ 40 Carroll was present at IMTS but did not witness the accident. He arrived at the scene soon afterward. He did not ask Neirinckx if he had a certification card and did not know if anyone else asked. Carroll did not tell Neirinckx that he needed to be retrained, nor did he direct Johnson to tell Neirinckx. He testified that he left a voicemail for Anthony Madrigal to send

Neirinckx and Nash home, but he later learned that was not done. Carroll could have told Neirinckx that he could not operate a forklift again until he was retrained. Carroll testified that the allowed crew size for a forklift operation was for a crew of two individuals but more could be assigned if warranted.

¶ 41    Anthony Madrigal testified that at IMTS in 2012, he oversaw part of the operations. At that time, he was vice president of national operations for GES. On September 18, 2012, he was present at IMTS but did not witness the accident and did not go to the scene. He admitted that he could have instructed Johnson to take Neirinckx off the floor and retrain him, but he did not do so. He further admitted that several other GES employees had the authority to remove Neirinckx from the floor and send him to be retrained. He also admitted to receiving a voicemail from Carroll telling him to send Neirinckx and Nash home, but he did not send them home. He contacted Larry Gibas, the superintendent in charge. He did not receive confirmation that Gibas sent them home, but he assumed they had been sent home.

¶ 42    GES had the rule, in compliance with OSHA, that any forklift driver involved in an injury-producing incident needed to be retrained and recertified. GES did not enforce that rule on September 18, 2102, or for the two days thereafter. Madrigal did not know if he was the person to ask on behalf of GES if there was a process in place to check certification. Madrigal testified that he was "high level" and he was "more overseeing the service of the show and the movement of the traffic." Madrigal believed there was a process in place to check certification, but that it was not followed. Madrigal had "very little" interaction with the riggers and did not know who Neirinckx was prior to the accident.

¶ 43 Madrigal testified that "drayage" is "the charging of moving the freight off the vehicle to the exhibit spot and then back to the truck after the show." Drayage is what the forklift operators do.

¶ 44 Larry Gibas was a superintendent at IMTS in 2012; he received "all the rigging, rigging labor for all the buildings," which included forklift operators. He was certified by Local 136 and reported to Madrigal. Mike Burns was his foreman in the south hall of McCormick Place, where the accident occurred. He was aware that all the forklift operators needed to be trained and certified. Gibas was not informed to check that forklift operators were trained and certified. He never checked for certification, nor did he instruct any GES management or personnel to check forklift certification.

¶ 45 Gibas knew Neirinckx for a long period of time. If Neirinckx called him to work at the IMTS, Gibas would not have asked Neirinckx if he was certified or trained recently. He understood that Neirinckx was not working regularly, but Neirinckx had worked the IMTS every year Gibas was the superintendent, which took place in the even years back to at least 2004. Gibas was not aware of anyone from GES being charged with the responsibility of ensuring OSHA compliance. He agreed that Neirinckx was not dispatched by Local 136. Prior to the accident, he was not aware of anyone ensuring that Neirinckx was trained and certified. Gibas had observed Neirinckx at IMTS in 2012, but he did not evaluate him.

¶ 46 In 2012, the protocol for a forklift operator involved in an accident was for that operator to advise the safety people, including Madrigal, Carroll, and Dave Mata, about the occurrence. Then they would "come over with their safety people and they kind of take the course from there." He testified that the involved crew automatically went for a drug test and, if they were cleared, "then we put them back to work." Gibas was unaware that an OSHA regulation required

a forklift operator to be retrained after an accident. Gibas testified that on the day of the accident, no one told him that Neirinckx needed to be sent home and get retrained.

¶ 47     Gibas testified that since he was a superintendent for GES, Neirinckx had unloaded the heaviest pieces in the show and he considered Neirinckx one of the most important forklift operators. Neirinckx was "a great help" for GES. Neirinckx was fast at "making picks" and was more productive. Gibas testified that the "past practice" of GES was to return employees to work after an incident if the drug test was negative. Gibas admitted that a forklift operator making a pick with the Versa Lift should have a spotter and it is reckless to operate it without one. It was a safety rule not to move the Versa Lift in the presence of pedestrians without a spotter.

¶ 48     Mike Burns was employed as a rigger, a member of Local 136, and was a certified forklift operator. He was the rigging general foreman for the south building at the 2012 IMTS. His responsibilities included staffing the job and overseeing the rigging work on the floor. The actual riggers would report to him, and he reported to Gibas. He knew Neirinckx, who worked under Burns. Burns described Neirinckx as an "experienced operator," and he handled "a lot of the very difficult moves that we have."

¶ 49     Burns was aware of the accident on September 18, 2012, but did not see it happen. Prior to that date, Burns had not seen Neirinckx operate the Versa Lift in an unsafe manner. Nash never reported to him that Neirinckx was operating unsafely or without a spotter. Burns admitted that he did not check certification, nor was he told by GES employees to check for certification. He agreed that Neirinckx was fast at making "picks," but fast did not necessarily mean unsafe.

¶ 50     David Mata was employed by GES; in 2012, his title was national operations manager, which required him "to travel to different cities and implement new processes and redefine the old process." His role involved the planning of freight movement and logistics. His supervisor

was Madrigal. Mata agreed that a forklift operator must be trained and certified every three years regardless of experience and that experience does not trump training and certification. OSHA regulations required this safety rule. Mata was a certified forklift operator.

¶ 51    Mata agreed that the Illinois legislature formerly required a three-person crew for every forklift, but the law changed in 2010 to require only a minimum two-person crew. He also agreed that GES still had the discretion to assign an extra crew member as safety required. He recognized this would be more expensive for GES. Mata acknowledged that the GES operations team decided before IMTS in 2012 that it was not going to utilize a three-person crew with the Versa Lifts.

¶ 52    Mata did not know at the time of the accident that an operator needed to be retrained, but he knew that requirement at trial. He did not have a procedure in place at IMTS in 2012 to check certifications. He admitted that no procedure existed for GES to check certifications at prior IMTS shows. He assumed that all the riggers, either dispatched by Local 136 or directly hired by GES, would be certified. If he had known prior to the accident that a forklift operator was not certified, Mata would have had the operator get "certified or sent home." Mata was on the floor of the hall, and if he saw anyone operating a machine unsafely, he would stop them. He did not recall seeing Neirinckx operate unsafely. If a crew requested a third crew member, then GES employees would check to see if one was needed. If additional crew members were needed, then they would be assigned.

¶ 53    Derek Pinnock testified that in 2012 he was employed by GES as the chief of security and safety. At the time of trial, he no longer worked for GES. According to Pinnock, beginning in 2009, GES implemented, as part of its business plan, the Lean Six Sigma plan, which eliminated safety managers. GES went from having about 7 to 10 safety managers in place

throughout the country to only two safety managers at the time of IMTS 2012. Prior to Lean Six Sigma's implementation, there was a safety manager devoted to Chicago, but there was no safety manager after its implementation. When Pinnock became chief of security and safety in 2012, he "had a vision to kind of build the safety program with additional managers."

¶ 54    Pinnock testified that OSHA regulations constituted minimum safety standards. He knew OSHA required employers to certify forklift operators and believed it was "absolutely" within GES policy to ensure that forklift operators were all certified, for the protection of human safety. Pinnock stated that when a company is cited for an OSHA violation, it has the option to contest the investigation or enter into an abatement process to show corrective measures the company wants to take. It was Pinnock's understanding that the corrective measures were to be "forever" once put in place. Pinnock was aware that GES was cited by OSHA in September 2004 and August 2009 for failing to ensure that forklift operators were certified every three years.

¶ 55    Pinnock was present at IMTS in 2012 for a few days during the move-in process but left because he had to return to Las Vegas for another large show. Pinnock was involved in the OSHA investigation of the accident involving plaintiff. During the investigation, he learned that Neirinckx was not certified. He agreed that certifications were not being checked and "the entire team could have [done] more. There was no single individual kind of heading up safety in that city." Pinnock testified about an e-mail concerning his observations while at IMTS which included making sure operators wore seatbelts and that operators not eat or hold handheld devices while using machinery. He wanted supervisory personnel to correct this "unsafe behavior" if observed. It was his expectation that certifications would be checked because "[i]t was a duty and responsibility *** that we had to do."

¶ 56    Jennifer Kaleta testified that she was employed as the director of litigation and legal services for Viad Corporation, the parent company of GES. She was the person most knowledgeable about prior OSHA violations by GES in 2004 and 2009.

¶ 57    Kaleta testified that OSHA found that GES violated the same OSHA regulation, pertaining to failing to have forklift operators certified every three years, on two prior instances. She could not locate anyone with personal knowledge of these OSHA violations. According to an exhibit, three noncertified forklift ·operators were found working at a Las Vegas convention center in 2004. The 2009 violation also occurred in Las Vegas. She could not determine who the GES safety manager was in 2004, but in 2009, the safety manager was Cedric Johnson, the safety manager for IMTS in 2012. However, Johnson told Kaleta he was not involved in the OSHA response in 2009.

¶ 58    Kaleta also discussed the process of abatement, which is where an OSHA citation is issued and, in response, the corporation advises OSHA that it will take permanent corrective measures. GES abated the violation in 2004. In 2009, when OSHA cited GES for the same violation, GES abated the violation a second time. Kaleta could not provide what corrective measures were taken in 2004 or in 2009 because no records were found due to purging of old files after three years.

¶ 59    Brian Avery was called as an expert for defendants. Avery reviewed correspondence between GES and Local 136 requiring all forklift operators to be certified prior to working at IMTS in 2012 and that on-site training was made available if operators needed to be certified. However, Neirinckx worked the show without certification due to "missteps" in communication. Avery opined that a forklift operator could be competent even if not certified because prior to 1999, certifications were not in effect and the operation was based on experience, skills, and

18

competency. He agreed that certified operators can have accidents but stated that was why OSHA required follow-up training programs after an accident occurred. He found it significant that GES did not know Neirinckx was not certified because it did not "deliberately" place people on the floor without certification. Yet, he later conceded on cross-examination that GES had no formalized procedures for certification in 2012.

¶ 60 Avery testified that Neirinckx did not believe plaintiff was near the forklift and there was no immediate danger, but that did not justify moving the forklift without a spotter. He stated that a two-person crew for the Versa Lift was a standard in the industry.

¶ 61 On cross-examination, Avery admitted a spotter is necessary on the Versa Lift. Avery conceded training and certification are of "utmost importance" to avoid injuries. Avery testified that it is also important for operators to acquire, retain, and use the necessary knowledge and skills to operate a forklift which is why certification is required every three years. OSHA has issued statements that certification aids in the prevention of injuries.

¶ 62 Avery acknowledged that no one ever tested or evaluated Neirinckx on the Versa Lift. He agreed the Versa Lift was released into operation 10 to 12 years before this incident, while Neirinckx had been semiretired for 8 to 10 years. Avery expected someone like Neirinckx to know safety rules such as, that you do not move a Versa Lift in the presence of pedestrians without a spotter. If Neirinckx did not know this, Avery had "reservations with respect to his abilities." GES was aware of the safety rules prior to the accident. If someone had made sure Neirinckx was trained, he would have been aware of these safety rules.

¶ 63 He agreed that a 58,000-pound forklift like the Versa Lift can cause devastating injuries. Avery admitted that the checking for OSHA certification is a requirement for the employer and,

as pointed out above, GES had no formalized procedure to check for certification at IMTS in 2012.

¶ 64   The jury also heard extensive medical testimony from several witnesses. Plaintiff provided testimony related to his surgeries and medical treatment after the injury. He was hospitalized at Northwestern Memorial Hospital from September 18, 2012 to October 12, 2012. After his first debridement surgery, plaintiff stated that the doctors tried leech therapy to "regain circulation," which failed. He was then given two options, either amputation or to try to reconstruct the heel of his foot using thigh muscle and a skin graft, and he opted for the skin graft operation. He was put in traction to elevate his foot to help the skin graft remain viable. Sometime later he was transferred to the Rehabilitation Institute of Chicago. He remained in a wheelchair after discharge from rehabilitation. He continued to receive in-home treatment. He estimated that he was on OxyContin for approximately a year and a half after that.

¶ 65   Plaintiff was out of work for about six months. He returned to Hermle but was not able to return to full time and left that job. He was unable to perform the physical aspects of his job with Hermle, including working shows and installing machines. Plaintiff subsequently began work with the Wisconsin Army National Guard in information technology. He estimated that the job was 60% sedentary and 40% on his feet, which included on-site training, giving people computers, and going to other places within the office.

¶ 66   Plaintiff had an Achilles lengthening surgery approximately a year after his first surgery. In December 2014, plaintiff also had a "debulking" surgery, which involved plastic surgery to make his foot fit in normal shoes and for aesthetics. He suffered a complication from that surgery when his skin graft failed. In February 2015, plaintiff had a new skin graft surgery. Plaintiff testified at trial that he still has to cut the back of his shoes off. His left foot remains bigger than

his right foot and requires a different size shoe. His foot remains stiff and it hurts. Plaintiff's knee has begun to hurt, especially if he walks without his cane. He walks with a permanent limp.

¶ 67    Plaintiff is able to do many normal activities, including driving, household chores, grocery shopping, walking the dog, and attending sporting events. He has also been able to vacation with his fiancée, by air and by car.

¶ 68    David Gibson testified that he was a senior analyst with Vocational Economics, Inc. He provided his opinion on plaintiff's lifetime loss of earning capacity based on 28.3 years of employment before retirement. Gibson testified that if plaintiff's disability did not allow him to remain in the military, then his lifetime loss of earning capacity would be between $1,172,054, and $1,202,814.

¶ 69    Crystal Daranikone, plaintiff's fiancée, testified to the limitations and pain plaintiff suffers since the incident. Patricia Marron, plaintiff's mother, testified to her observations of plaintiff's pain and difficulty walking, as well as plaintiff's military service in Iraq. Kurt Ullenberg testified to knowing plaintiff in the Wisconsin Army National Guard, including during a deployment to Iraq, described plaintiff's pride in serving in the military, and described plaintiff before and after the injury. Ullenberg recounted that plaintiff's injury left him incapable of further deployment in the military.

¶ 70    Following deliberations, the jury found in favor of plaintiff on count I and against Neirinckx and GES and awarded compensatory damages in the total amount of $12,228,068. This total amount was itemized as follows: $578,068 for reasonable expense of necessary medical care, treatment and services received; $400,000 for present cash value of the reasonable expense of medical care, treatment and services reasonably certain to be received in the future; $350,000 for the present cash value of earnings reasonably certain to be lost in the future;

21

$1,000,000 for the disfigurement resulting from this injury; $300,000 for the increased risk of future harm resulting from the injuries; $350,000 for the emotional distress experienced and reasonably certain to be experienced in the future; $3,000,000 for the physical pain and suffering experienced as a result of the injuries; $2,000,000 for the physical pain and suffering reasonably certain to be experienced in the future as a result of the injuries; $1,250,000 for the loss of a normal life experienced; and $3,000,000 for the loss of a normal life reasonably certain to be experienced in the future.

¶ 71    On count II, the jury found in favor of Neirinckx. On count III, the jury found in favor of plaintiff and against GES and awarded $3 million in punitive damages. In addition, the jury answered special interrogatories regarding the willful and wanton counts. The first interrogatory asked the jury to indicate if it found for plaintiff or each of the defendants on counts II and III. Under count II, the jury indicated "no," that it was not finding in favor of plaintiff. The jury marked "no" in response to the question, "Did GES ratify or approve the conduct of Defendant Neirinckx in Count II?" In the second special interrogatory, under count II, the jury was asked if the conduct of Neirinckx as alleged was willful and wanton, and they marked the "no" option.

¶ 72    The jury answered "yes" in favor of plaintiff on count III and assessed punitive damages against GES. In the third special interrogatory, under count III, when asked if the conduct of GES as alleged was willful and wanton, the jury marked "yes." The jury also indicated a "yes" response to the question of whether the conduct of GES as alleged in count III proximately caused injury to plaintiff.

¶ 73    In September 2015, defendants filed their posttrial motion making several alternative requests for relief. First, defendants sought a JNOV on the willful and wanton conduct count against GES, a remittitur of the total compensatory damages from $12,228,068 to $3,214,593,

and a reduction of the amount awarded for past medical expenses. Their first alternative request was for a remittitur of the punitive damages from $3 million to $0 and the same two additional requests on compensatory damages and past medical expenses as the first request for relief. The second alternative request for relief sought a JNOV on the willful and wanton count against GES or a remittitur of punitive damages to zero and a new trial on count I, the negligence count.

¶ 74 In January 2016, the trial court entered its order on defendants' posttrial motion. The court denied defendants' request for a new trial on count I as well as their request for a remittitur of the compensatory damages. However, the trial court granted GES's request for a JNOV as to count III, the willful and wanton count, finding that GES's "conduct could never be the proximate cause of Plaintiff's injuries." Following this order, plaintiff filed a posttrial motion to reconsider the trial court's grant of JNOV on the willful and wanton count against GES. In May 2016, following a hearing, the trial court denied plaintiff's motion to reconsider and its JNOV on count III stood.

¶ 75 All parties have appealed. On February 1, 2016, GES filed a notice of appeal, which was subsequently amended to include Neirinckx. Defendants filed a second notice of appeal on May 26, 2016, following the court's ruling on plaintiff's posttrial motion. On May 31, 2016, plaintiff filed his notice of appeal from that portion of the order entered January 4, 2016, granting the JNOV for count III, and from the order entered May 20, 2016, denying plaintiff's motion to reconsider that order. All notices of appeal were filed in compliance with Illinois Supreme Court Rule 303 (eff. Jan. 1, 2015). Accordingly, this court has jurisdiction of this consolidated appeal under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 76 We first consider defendants' argument that the trial court erred in denying their motion for a new trial on count I. Specifically, defendants contend that the trial court improperly allowed

23

the willful and wanton count against GES to be presented to the jury and the admission of that evidence deprived them of a fair trial on the negligence claim. "[O]n a motion for a new trial, the trial court will weigh the evidence and order a new trial if the verdict is contrary to the manifest weight of the evidence." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 38. "A verdict is against the manifest weight of the evidence only where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary and not based upon any of the evidence." *Id.* We review the trial court's ruling on a motion for a new trial for an abuse of discretion. *Id.*

¶ 77    Plaintiff initially asserts that defendants have forfeited our review of this issue by failing to properly raise it in their posttrial motion and by filing an answer to the fifth amended complaint. Plaintiff contends that defendants' motion for a new trial did not ask the trial court to consider a new trial based on the failure to dismiss count III. Plaintiff admits that defendants raised issues concerning the propriety of count III and the evidence for count III before and during trial, but plaintiff claims that the trial court was not given the opportunity to consider how the evidence for count III affected the jury's verdict. Plaintiff notes that defendants' motion argued that the verdict was contrary to the manifest weight of the evidence "for all the reasons set forth above," which included the arguments for JNOV on count III as unsupported by the evidence or was inadmissible.

¶ 78    In response, defendants maintain that the issue was properly preserved in their posttrial motion. According to defendants, they "requested a new trial on Count I on the ground that they were deprived of a fair trial as follows: 'for all of the reasons set forth above in Arguments I through V and incorporated by reference as if set forth fully here, the cumulative effect of trial

24

errors deprived defendants of a fair trial such that the verdict was affected and a new trial is required.' "

¶ 79    We agree with defendants that there has been no forfeiture regarding count III alleging willful and wanton misconduct against GES. Furthermore, even if defendants had forfeited this argument on appeal, forfeiture is a limitation on the parties, not on the courts. *1550 MP Road LLC v. Teamsters Local Union No. 700*, 2017 IL App (1st) 153300, ¶ 15. We consider the merits of defendants' argument.

¶ 80    Defendants contend that the trial court erred by failing to dismiss the willful and wanton conduct count against GES after GES admitted *respondeat superior* liability for the actions of Neirinckx and the evidence presented on that claim deprived them of a fair trial as to the negligence count against both defendants. As discussed above, prior to trial, defendants admitted Neirinckx's negligence and that GES was liable under the doctrine of *respondeat superior*. GES also admitted *respondeat superior* for any willful and wanton conduct by Neirinckx if the jury found against him. Defendants then moved to dismiss both the direct negligence count against GES as well as the willful and wanton count against GES. The trial court dismissed the direct negligence count, but denied the motion as to willful and wanton count. The court found that under *Lockett v. Bi-State Transit Authority*, 94 Ill. 2d 66 (1983), the willful and wanton count was not eliminated by admitting *respondeat superior* and negligence.

¶ 81    Defendants argue that under *Neff v. Davenport Packing Co.*, 131 Ill. App. 2d 791 (1971), and its progeny, the trial court was required to dismiss all counts directed at GES's actions once it had admitted *respondeat superior* liability for Neirinckx.

¶ 82    In *Neff*, the plaintiff's decedent was in an accident with an employee driving a vehicle for his employer. The plaintiff filed a complaint against the driver and the driver's employer alleging

25

both negligence under a *respondeat superior* theory, as well as negligent entrustment directly against the employer. The employer subsequently admitted that the employee was its agent and operating within the scope of employment and if the employee were liable the employer would also be liable under the doctrine of *respondeat superior*. The employer also moved to dismiss the negligent entrustment count as "irrelevant" since it had admitted agency. The trial court denied the motion, but certified that no just cause should delay the appeal. *Id.* at 791-92.

¶ 83    On appeal, the reviewing court opined:

> "Where as in the case at bar, the link between the tort feasor and some other party is admitted, as by the principal in the case at bar, there appears to be some division of opinion concerning the propriety of proceeding on liability when based on negligent entrustment. The majority view and the view with which we agree seems to be that issues relating to negligent entrustment become irrelevant when the party so charged has admitted his responsibility for the conduct of the negligent actor. The liability of the third party in either case is predicated initially upon the negligent conduct of the driver and absent the driver's negligence the third party is not liable. Permitting evidence of collateral misconduct such as other automobile accidents or arrests for violation of motor vehicle laws would obscure the basic issue, namely, the negligence of the driver, and would inject into the trial indirectly, that which would otherwise be irrelevant." *Id.* at 792.

¶ 84    The *Neff* court held that the trial court erred in failing to dismiss the negligent entrustment count against the employer. Under *Neff*, when a principal admits responsibility for its agent's negligence, then any liability alleged under an alternative theory, such as negligent entrustment or negligent hiring, becomes irrelevant and should properly be dismissed. *Id*. at 792-93. The holding in *Neff* was later reaffirmed by this court. See *Ledesma v. Cannonball, Inc.*, 182 Ill. App. 3d 718 (1989) (relying on *Neff* to affirm the dismissal of negligent entrustment claim after employer admitted employee was acting in scope of employment); *Gant v. L.U. Transport, Inc.*, 331 Ill. App. 3d 924 (2002) (holding *Neff* remains valid after adoption of comparative negligence doctrine).

¶ 85    Plaintiff maintains that the trial court correctly allowed count III alleging willful and wanton conduct by GES to proceed to trial. Plaintiff relies on the Illinois Supreme Court's decision in *Lockett v. Bi-State Transit Authority*, 94 Ill. 2d 66 (1983), to support his position that the willful and wanton count against GES remained viable after GES admitted *respondeat superior* liability. In *Lockett*, the plaintiff's decedent was killed while crossing the street after being struck by a bus driven by the defendant's employee. Prior to trial, the plaintiff dismissed a claim against the bus driver. The plaintiff's initial complaint against the employer bus company alleged negligence and willful and wanton misconduct, but it later was amended to add counts of negligent entrustment and willful and wanton entrustment. The plaintiff's amended complaint alleged that the defendant bus company was guilty of negligent entrustment and willful and wanton entrustment because it allowed its employee driver to operate the bus despite knowledge of his prior reckless driving and unsafe practices. On the defendant's motion, the trial court later dismissed those two counts for negligent entrustment and willful and wanton entrustment for failure to state a cause of action.

¶ 86     Prior to trial, the circuit court granted the defendant's motion *in limine* barring evidence concerning the driver's prior driving record with the company, including instances of misconduct and employment status after the accident. During the trial, the plaintiff's attorney asked the driver's supervisor when the driver was terminated. The defendant's attorney objected and the trial court sustained the objection, instructing the jury to disregard the question. The jury found the plaintiff's decedent to be contributorily negligent, but not guilty of contributory willful and wanton misconduct and found the defendant guilty of willful and wanton misconduct. *Id.* at 71-72. On direct appeal, the appellate court found that the question at trial concerning the termination of the driver's employment violated the order on the motion *in limine* to the prejudice of the defendant. A majority of the appellate court reversed and remanded the matter for a new trial. *Id*. at 72-73.

¶ 87     On appeal, the supreme court found an allegation in the remaining willful and wanton misconduct count was "identical" in substance to the dismissed count of willful and wanton entrustment. *Id*. at 74. This allegation alleged that the defendant bus company was guilty of willful and wanton misconduct because it allowed the driver to drive the bus despite its knowledge of his prior reckless driving and unsafe practices. *Id*.

¶ 88     The supreme court discussed the defendant's reliance on *Neff* and its reasoning, in that the purpose was "to create a chain of liability" where the principal was charged with the negligence of its agent tortfeasor. Once the principal admitted responsibility for its agent tortfeasor, then the admission of evidence of the principal's misconduct becomes unnecessary. *Id.* at 73. However, the *Lockett* court distinguished the basis of a willful and wanton entrustment claim from negligent entrustment.

"In cases involving wilful and wanton entrustment, however, the analysis necessarily differs from that of negligent entrustment. Unlike the situation in negligent-entrustment cases, where the misconduct of the defendant-principal is of the same level of culpability as that of the tortfeasor-agent, defendants-principals may be found guilty of wilful and wanton misconduct even though the tortfeasors-agents to whom the instrumentality causing the injury was entrusted may have been only negligent. Furthermore, while contributory negligence by the plaintiffs would, prior to *Alvis*, bar recovery in actions for negligent entrustment, it would not preclude recovery when the defendants were guilty of wilful and wanton misconduct. Consequently, the necessity of proof of the defendant-principal's misconduct in connection with wilful-and-wanton-entrustment actions is not eliminated simply because that party acknowledges an agency relationship with the tortfeasor." *Id*. at 73.

¶ 89 Thus, the supreme court clarified that a principal can be found guilty of willful and wanton misconduct even when the agent tortfeasor's conduct was merely negligent. The supreme court held that proof of the driver's record was highly relevant, if not essential, to the plaintiff's case and to preclude its use was, in practical effect, to abolish the plaintiff's cause of action for willful and wanton misconduct; therefore, the *in limine* order that prevented the admission of the driver's record was unjustified. *Id*. at 74. For this reason, the supreme court found the appellate

court's decision granting the defendant bus company a new trial to be erroneous. It reversed the appellate court and affirmed the circuit court judgment in favor of the plaintiff. *Id*. at 75.

¶ 90    We recognize the general rule that under *Neff* allegations of an employer's negligence should be dismissed when an employer admits an agency relationship because the allegations of direct negligence are duplicative of the admitted agency liability. However, there is no sound reason for such a rule where a plaintiff has pled a viable claim for punitive damages based on allegations of willful and wanton conduct against an employer for its independent actions in hiring and retaining an employee or entrusting a vehicle to an unfit employee.

¶ 91    Although Illinois decisions have not specifically addressed the issue here, other jurisdictions have long recognized this exception to the *Neff* rule. For example, in *Estate of Arrington v. Fields*, 578 S.W.2d 173 (Tex. Civ. App. 1979), a Texas decision, the plaintiff filed a personal injury action arising from an incident in which the plaintiff was shot during an altercation with a security guard outside a convenience store. In that case, the plaintiff entered a convenience store to make a purchase. The security guard for the store was in uniform and armed with a handgun. The guard thought he saw the plaintiff shoplift an item and approached the plaintiff. The guard stopped the plaintiff and searched him, but failed to recover any stolen items. Words were exchanged between the men. The plaintiff left the store with his groceries. The guard admitted that the plaintiff was not a threat to the store or himself, but still he followed the plaintiff out of the store. Once outside, the men offered conflicting testimony of what transpired. The plaintiff testified that the guard assaulted him from behind with a nightstick and as the plaintiff attempted to leave the premises, the guard continued to beat him. The guard then pulled out his firearm, threatened to kill the plaintiff, and shot the plaintiff. According to the guard, he stepped out of the store with his nightstick in his hand and the plaintiff jumped out from behind

some telephone booths and tackled him. During the struggle, the plaintiff tried to grab the guard's gun. The gun discharged and struck the plaintiff in the lower abdomen. The plaintiff picked up his groceries and started to leave, but the guard kicked him to detain him until the police and an ambulance could arrive. *Id*. at 175-76.

¶ 92 The plaintiff filed an action seeking recovery from both the security guard's employer based on its negligent hiring as well as gross negligence and from the security guard for his negligence and gross negligence in shooting the plaintiff. *Id*. at 175. The evidence disclosed that the security guard had indicated on his job application that he had a criminal record, but no inquiry was made by the company to discover the guard's lengthy criminal record. The security guard had a total of seven prior criminal convictions, four of which resulted in prison terms. *Id*. at 177. The guard's convictions included burglary with intent to commit theft, grand larceny, burglary, and a charge relating to a fraudulent check. *Id.* The employer agreed that a person with a criminal record should not be hired as a security guard and there was a need for a thorough screening of potential employees. Further, the security guard was issued a firearm without any training or instructions. The employer described the training as " 'on-the-job' " and an undetermined amount of classroom instruction. *Id*. at 176.

¶ 93 The jury found in favor of the plaintiff. Specifically, in response to special issues submitted, the jury found the employer acted negligently and was guilty of gross negligence. The jury also found the security guard acted negligently and was guilty of gross negligence. The jury refused to find the plaintiff provoked the security guard such that the guard's actions were reasonable or in self-defense. The jury awarded the plaintiff $500,000 in compensatory damages against the employer and the security guard, jointly and severally, as well as $200,000 in

exemplary damages against the employer, and $100,000 in exemplary damages against the security guard. *Id*.

¶ 94    On appeal, the employer argued, among other things, that the plaintiff's claim of negligent hiring was rendered moot by its stipulation that the security guard was within the course and scope of his employment at the time of the altercation. *Id*. at 178. The Court of Civil Appeals of Texas disagreed with the employer's argument and found that "where liability for exemplary damages is sought to be charged against the servant, a stipulation of course and scope of employment by the master may not preclude proof of negligent hiring and thereby prevent imputation of the servant's liability to the master." *Id*. at 179. Further, "Texas courts have long recognized the master's duty to make inquiry as to the competence and qualifications of those he considers for employment, especially where engaged in an occupation which could be hazardous to life and limb and requires skilled or experienced servants. This is a duty owed by the master to his other servants and to the public." *Id*. at 178.

¶ 95    The reviewing court recognized a pattern where the primary factor that distinguishes cases is whether punitive damages are sought by the plaintiff. The court discussed its version of the *Neff* rule. "Where only ordinary negligence is alleged, the case law supports appellants' contention that negligent hiring and *respondeat superior* are mutually exclusive modes of recovery. In cases where the plaintiff was relying upon the theory of negligent entrustment of a motor vehicle, the courts have refused to permit the plaintiff to proceed with this separate ground of recovery against the owner where the derivative liability of the owner has already been established by an admission or stipulation of agency or course and scope of employment." *Id*. at 178.

¶ 96    However, the reviewing court recognized an exception.

"[A] different situation is presented where the plaintiff has alleged ordinary negligence against the driver and gross negligence against the owner for entrusting his vehicle to a reckless or incompetent driver. In such cases, the courts have recognized that the negligent entrustment cause of action would be an independent and separate ground of recovery against the owner for exemplary damages. [Citations.] The owner of a vehicle, charged with gross negligence in the entrustment of a vehicle, may not preclude proof thereof by admitting or stipulating agency on the part of the driver or that the driver was within the course and scope of employment. [Citations.] A master may be guilty of gross negligence in hiring an incompetent servant and held liable for exemplary damages where the servant is only found guilty of ordinary negligence." *Id*. at 178-79.

¶ 97 The reviewing court noted the well settled law that a master may be subject to derivative liability for exemplary damages arising from the acts of the servant when (1) the master authorized the act, (2) the servant was in a managerial position and acting in scope of employment, (3) the master ratified the act, or (4) the master was negligent in employment of the servant. *Id*. at 179.

¶ 98 The plaintiff had alleged both the employer and the security guard were guilty of gross negligence and sought punitive damages against both. The reviewing court affirmed the jury's finding that the employer failed to exercise reasonably prudent care in investigating the security guard's background, which was a proximate cause of the plaintiff's injuries, and the employer

33

was guilty of gross negligence. *Id*. at 176, 184. The court also affirmed the jury's finding that the security guard failed to act as a reasonably prudent security guard should have acted under the circumstances and he was guilty of gross negligence. *Id*. at 180-81.

¶ 99    In *Wilson N. Jones Memorial Hospital v. Davis*, 553 S.W.2d 180 (Tex. Civ. App. 1977), the plaintiff sued the defendant hospital for negligence and sought exemplary damages after an employee orderly removed a catheter from the plaintiff without proper training. The jury found the hospital was "reckless" in employing the orderly and awarded compensatory and exemplary damages. The evidence established the orderly was hired by the hospital without following its own policy to check professional or personal references, which would have disclosed his expulsion from the Navy Medical Corps School after one month of training as well as a drug history and criminal record. *Id*. at 181-82. The Court of Civil Appeals of Texas observed that "[h]ere we have for all practical purposes a complete disregard of, and a complete violation of the stated hiring policies of the Hospital." *Id*. at 182.

¶ 100 On appeal, the hospital asserted that the evidence failed to support the jury's determination that the hospital was reckless in hiring the orderly and the award of exemplary damages. The reviewing court rejected the hospital's arguments, finding "there is evidence of probative force in the record to the effect that the [hospital] demonstrated an entire want of care as to indicate that the hiring of [the orderly] was the result of conscious indifference to the rights, welfare and safety of the patients in the hospital." *Id*. at 183. The court relied on the Texas rule that: "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if *** '(b) the agent was unfit and the principal was reckless in employing him ***.' " (Internal quotation marks omitted.) *Id*. at 183 (quoting *King v. McGuff*, 234 S.W.2d 403, 405 (Tex. 1950)).

¶ 101   In *Hines v. Nelson*, 547 S.W.2d 378, 380 (Tex. Civ. App. 1977), the plaintiff filed a personal injury action following an automobile collision between the plaintiff and the defendant's employee alleging both negligence and gross negligence of the employee while in the course and scope of employment for the defendant employer as well as direct negligence and gross negligence against the employer for hiring and entrusting a tractor-trailer to the employee. On appeal, the defendant argued that the theories of *respondeat superior* and negligent entrustment were mutually exclusive forms of recovery. *Id*. at 385. The appellate court found that "[i]n cases involving allegations of ordinary negligence against the driver and gross negligence against the owner for entrusting his vehicle to a reckless or incompetent driver, we feel there would be a separate ground for damages against the owner in the form of exemplary damages." *Id*. The reviewing court followed the reasoning set forth in *Adams*, finding that evidence of a driver's prior conduct would be immaterial as to the driver's negligence, but it was relevant for the plaintiff's attempt to use as evidence of gross negligence in entrusting a vehicle to a reckless or incompetent driver. *Id*. at 385-86. However, after reviewing the driver's prior record, the court held that the record failed to show the driver was a reckless driver and should not be used indirectly to establish recklessness. *Id*. at 386. The court reversed the trial court's judgment and entered an award of compensatory damages to the plaintiff. *Id*.

¶ 102   In *Adams Leasing Co. v. Knighton*, 456 S.W.2d 574 (Tex. Civ. App. 1970), the plaintiff was injured in an automobile accident and filed an action against the owner and the driver of a vehicle. The jury awarded the plaintiff both compensatory and exemplary damages. On appeal the defendants asserted that the trial court erred in allowing (1) a claim of gross negligence against the owner to stand when no finding of gross negligence had been found against the driver and (2) the employee's driving record into evidence when the owner had stipulated that the

driver was acting in the course and scope of his employment and the stipulation precluded gross negligence by the owner. The Texas reviewing court found that the owner had forfeited the issues by not raising them in a motion for a new trial. *Id*. at 576.

¶ 103 Nevertheless, the court further reasoned: "Were we confronted with appellants' contention [] that an entrustor may not be held liable for gross negligence where the person to whom a vehicle is entrusted is not shown to be guilty of other than ordinary negligence. Such [a] contention has been resolved to the contrary. *** Nor may a defendant charged with gross negligence in the entrustment of a vehicle preclude proof thereof by stipulating agency on the part of the person to whom such vehicle is entrusted." *Id*.

¶ 104 The *Adams* court cited the decision in *Goff v. Lubbock Building Products*, 267 S.W.2d 201 (Tex. Civ. App. 1953), for support. In *Goff*, the plaintiff filed sued against a corporation for actual and exemplary damages arising from a collision in which the plaintiff's decedent was killed. A truck owned by the corporation was operated by the corporation's employee within the scope of his employment at the time of the accident. *Id*. at 201. At the jury trial, the corporation admitted liability for actual damages, but denied the amount sought by the plaintiff. The corporation also denied liability for any gross negligence. The jury awarded both actual and exemplary damages to the plaintiff, but on the corporation's motion, the trial court set aside the jury's finding of gross negligence and award of exemplary damages. *Id*. at 202.

¶ 105 On appeal, the Texas reviewing court recognized that the term "gross negligence" meant " 'an entire failure to exercise care, or by the exercise of so slight a degree of care as to justify the belief that the person on whom care was incumbent was indifferent to the interest and welfare of others.' " *Id*. at 205 (quoting *International & G.N.R. Co. v. Cocke*, 64 Tex. 151, 156 (Tex. 1885). After observing that "[e]xemplary damages may be awarded against a corporation

because of gross negligence of its agents," the court found sufficient evidence to support the jury verdict and reinstated the award of exemplary damages. *Id*. at 206.

¶ 106   In *Plummer v. Henry*, 171 S.E.2d 330 (N.C. Ct. App. 1969), the plaintiff sought to recover compensatory and punitive damages for his intestate son who died as a result of injuries caused by the defendants. There, the defendant's son operated a vehicle that struck the plaintiff's decedent in a crosswalk. *Id*. at 331. The plaintiff sought recovery under two theories: under that state's family purpose doctrine based on *respondeat superior* and negligent entrustment. The plaintiff alleged willful and wanton conduct against both the father and the son. The plaintiff appealed an order striking his claim for compensatory and punitive damages based on negligent entrustment. *Id*. at 332-33. The defendants contended that their stipulation that any negligence of the driver is imputable to the owner under the family purpose doctrine rendered all allegations of negligent entrustment irrelevant and prejudicial. *Id*. at 333. On appeal, the Court of Appeals of North Carolina found the negligent entrustment allegations were not made immaterial by the stipulation. *Id*. at 334.

> "In the present case the plaintiff has alleged that the owner-defendant knew or ought to have known that his son was driving his automobile in the area of the school in a careless, reckless, negligent and unlawful manner and in a manner likely to endanger the safety of children in and about said school, and that in spite of said knowledge the owner-defendant 'knowingly, willfully, and wantonly,' continued to permit his son to operate his automobile upon the public streets in and around said school without restriction and even altered the engine so as to increase the speed

of the automobile. Thus, the plaintiff has not only alleged liability of the owner-defendant for compensatory damages on the negligent entrustment theory, but has further alleged facts which, if proved, would justify an award of punitive damages against the owner for his own wanton negligence. By admitting applicability of the family purpose doctrine, defendants have certainly not admitted any willfulness or wantonness on the part of the owner-defendant in continuing to entrust the vehicle to his minor son. Therefore, the defendants' stipulation did not render immaterial the plaintiff's allegations as to negligent entrustment." *Id*.

The reviewing court reversed the striking and amending of counts in the plaintiff's complaint. *Id*. at 335.

¶ 107　Recently, in *CRST, Inc. v. Superior Court*, 218 Cal. Rptr. 3d 664 (Cal. Ct. App. 2017), the plaintiffs filed a personal injury action arising from a vehicular accident in which a freightliner driven by the defendants' employee struck the plaintiffs' vehicle. The plaintiffs alleged negligent operation of a motor vehicle against the employee and the defendants as well as negligent entrustment and negligent hiring against the defendants. The plaintiffs also included a request for punitive damages against both the employee and the defendants for each claim. *Id*. at 667-68. The defendants admitted vicarious liability for their employee and then sought summary judgment for the negligent entrustment and negligent hiring claims as well as the respective claims for punitive damages. The trial court denied their motion. *Id*. at 668. The employee also sought summary judgment on the request for punitive damages, which the trial

court granted, finding a lack of proof. *Id*. The defendants appealed only the denial of summary judgment as to the punitive damages.

¶ 108   On appeal, the California Court of Appeal considered first whether the plaintiffs' claim for punitive damages was barred by the California Supreme Court decision in *Diaz v. Carcamo*, 253 P.3d 535 (Cal. 2011), and then whether there were any triable issues under section 3294 of the Civil Code. Cal. Civ. Code § 3294 (West 2016). The reviewing court discussed the *Diaz* decision, which followed the rule set forward in *Armenta v. Churchill*, 267 P.2d 303 (Cal. 1954), barring the introduction of evidence of an employer's negligence after an admission of vicarious liability similar to the *Neff* rule in Illinois. "Because the owner's admission of vicarious liability established her liability for the driver's tort, 'there was no material issue remaining to which the offered evidence could be legitimately directed.' " *CRST*, 218 Cal. Rptr. 3d at 671 (quoting *Armenta*, 267 P.2d at 309). The court noted that *Armenta* was decided before the adoption of the comparative fault system. *Id*. *Diaz* was decided after its adoption but "restated and endorsed the *Armenta* rule, which it characterized as 'bar [ring]' a claim for negligent entrustment when the employer admits vicarious liability for an employee's negligent conduct." *Id*. at 672 (quoting *Diaz*, 253 P3d at 542).

¶ 109   Nevertheless, the court in *CRST* distinguished *Diaz* and *Armenta* from cases involving claims for punitive damages. The court reasoned that neither case "addressed an action in which punitive damages were sought, in each case the employer's admission of vicarious liability necessarily rendered superfluous any allegations or evidence bearing on the employer's own misconduct." *Id*. The court held that "when an employer such as CRST admits vicarious liability, neither the complaint's allegations of employer misconduct relating to the recovery of punitive damages nor the evidence supporting those allegations are superfluous." *Id.*

¶ 110 The reviewing court ultimately reversed the denial of summary judgment after concluding no triable issues existed under section 3294 of the California Civil Code. *Id*. at 680.

¶ 111 *Clooney v. Geeting*, 352 So.2d 1216 (Fla. Dist. Ct. App. 1978), is a Florida decision which arose out of motor vehicle accident. The plaintiff was a passenger in a vehicle that was forced off the road when another driver returned into the lane after narrowly avoiding a head-on collision while passing other vehicles. The vehicle in which the plaintiff was a passenger lost control and swerved back onto the road into the path of the defendant's truck, operated by its employee. The plaintiff filed suit against the employer, its insurer, its driver, the driver that forced the plaintiff's vehicle off the road, and his insurer. Following trial, the jury awarded the plaintiff damages from the driver of the passing vehicle but found the employer and its driver not liable. *Id*. at 1218. The District Court of Appeal of Florida, Second District, reversed and remanded for a new trial based on an error in causation instructions given to the jury. *Id*. at 1219.

¶ 112 The court also considered the plaintiff's argument that the trial court erred in striking several counts related to negligent hiring and entrustment as well as his claim for punitive damages. The reviewing court affirmed the dismissal, finding that the plaintiff's allegations did not give rise to willful and wanton disregard for the rights of others. *Id*. However, the court recognized in *dicta* that

> "factual situations could arise where one of the referred-to theories
> would impose additional liability. If the allegations in this case had
> been sufficient to allow the claim for punitive damages to go
> before the jury, this would be such a case. Another example might
> be where an owner or authorized custodian of a motor vehicle who
> knows that the vehicle has defective brakes allows one who is not

aware of this dangerous condition to use it, and because of the bad brakes an accident occurs. If the driver were found not to be negligent, the owner could not be held vicariously liable. So the means of imposing liability on the owner would be through his own negligence of lending the car with bad brakes, *i.e.*, negligent entrustment." *Id*. at 1220.

See also *Durben v. American Materials, Inc.*, 503 S.E.2d 618, 619 (Ga. Ct. App. 1998) (The Court of Appeals of Georgia recognized "an exception exists for this general rule, however, where a plaintiff has a valid claim for punitive damages against the employer based on its independent negligence in hiring and retaining the employee or entrusting a vehicle to such employee. In such case, it cannot be said that the negligence claims against the employer are merely duplicative of the *respondeat superior* claim.") *Cf. Ferrer v. Okbamicael*, 390 P.3d 836, 839 (Colo. 2017) (holding that under Colorado law, the recovery of punitive damages is barred where the employer has admitted vicarious liability).

¶ 113    Having reviewed *Lockett* and several out of state cases, it is clear that claims alleging willful and wanton conduct by an employer are not extinguished by an admission of *respondeat superior* liability for the actions of the employee. These cases recognize that there is an exception to the general rule as set forth in *Neff* for claims of negligence. In particular, we note that the conclusion reached by the Texas reviewing court in *Estate of Arrington* speaks directly to the issues raised on appeal here. As previously discussed, the Texas court concluded that "[a] master may be guilty of gross negligence in hiring an incompetent servant and held liable for exemplary damages where the servant is only found guilty of ordinary negligence." *Estate of Arrington*, 578 S.W.2d at 179. While we are not bound by these cases from other jurisdictions,

we may look to them for guidance. *Independent Trust Corp. v. Kansas Bankers Surety Co.*, 2011 IL App (1st) 093294, ¶ 24.

¶ 114    Additional support for the trial court's decision on this issue is found in the Restatement (Second) of Agency. Under Section 213(d) of the Restatement, a person who acts through its agents can be liable for harm from his or her conduct if negligent or reckless in permitting or failing to prevent negligent conduct by persons upon premises or instruments under his or her control. Restatement (Second) of Agency § 213(d) (1958). Comment *d* to section 213 further instructs that liability is not merely because the employee is careless, but liability results because "the employer has not taken the care which a prudent [person] would take in selecting the person for the business in hand." *Id.* § 213, cmt. *d*. Moreover, "[i]f *** the work is likely to subject third persons to serious risk of great harm, there is a special duty of investigation." *Id.*

¶ 115    Additionally, section 217C discusses the imposition of punitive damages against a principal due to the acts of an agent if the principal authorized the doing and manner of the act or the agent was unfit and the principal was reckless in employing him. *Id.* § 217C.

¶ 116    A review of several decisions by our appellate court also demonstrates that trial courts have applied this exception to the *Neff* rule in this manner. For example, in *Ledesma*, 182 Ill. App. 3d 718, the plaintiff was riding a bicycle when she was struck by a vehicle driven by the defendant's employee in the course of his employment. The plaintiff filed a complaint against the defendant employer and employee. The plaintiff later settled with the employee. The complaint against the employer alleged negligence under the doctrine of *respondeat superior* and negligent entrustment as well as willful and wanton conduct under the same two theories. The trial court dismissed all the counts except willful and wanton entrustment on which the court granted summary judgment in favor of the employer. *Id.* at 721-23.

¶ 117    On appeal, the reviewing court reversed the dismissals of the negligence count and willful and wanton conduct based on the doctrine of *respondeat superior*, but affirmed the dismissal of the negligent entrustment count, relying on *Neff*. *Id.* at 726-28. The plaintiff also challenged the grant of summary judgment on her claim of willful and wanton entrustment. After considering the evidence presented, the court affirmed the grant of summary judgment because no question of material fact was raised as to the willful and wanton allegations. *Id*. at 729-30.The reviewing court found that the plaintiff failed to show that the employer was required to investigate the employee's driving record such that it acted with an actual or deliberate intent to harm or an utter indifference or conscious disregard for the safety of others. *Id.* at 729. Thus, the court ultimately concluded that there was no dispute of a material fact and summary judgment was properly granted. *Id*. at 730. Notably, neither the trial court nor the reviewing court concluded that the plaintiff could not maintain separate claims for willful and wanton operation of a vehicle under a theory of *respondeat superior* and willful and wanton entrustment of a vehicle. While the willful and wanton entrustment claim was unsuccessful, the summary judgment ruling was based upon a lack of a disputed issue of a material fact, not that the count could not be maintained under *Neff*.

¶ 118    The *Ledesma* court relied on the decision in *Richards v. Checker Taxi Co.*, 168 Ill. App. 3d 154 (1988), when reviewing the grant of summary judgment on the willful and wanton negligent entrustment count. In *Richards*, the plaintiff was injured in an accident when she was a passenger in a taxi operated by the defendant's employee. At trial, the plaintiff sought damages against the employer for claims of negligence under the doctrine of *respondeat superior* and willful and wanton entrustment of the cab to the employee. The jury awarded both compensatory and punitive damages. *Id*. at 155-56.

¶ 119   On appeal, the employer argued that the trial court erred in entering judgment on the jury's verdict on the willful and wanton count because the evidence did not support the jury's finding. The reviewing court observed that, "[a] cause of action may be maintained against a principal for negligent or wilful and wanton entrustment of a motor vehicle to an agent of the principal." *Id.* at 156 (citing *Lockett*, 94 Ill. 2d at 73). "Wilful and wanton conduct is 'a course of action which shows actual or deliberate intention to harm, or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others.' " *Id.* (quoting Illinois Pattern Jury Instructions, Civil, No. 14.01. (2d ed. Supp. 1981)). "Thus, the misconduct that is necessary to prove wilful and wanton entrustment is different than the misconduct that is necessary to prove negligent entrustment." *Id.* Although the court found that the plaintiff's evidence did not amount to willful and wanton conduct and reversed the jury's verdict as to this claim, it did so only after determining the evidence did not establish the claim, not because it should have been dismissed under the *Neff* rule. *Id.* at 157.

¶ 120   Most recently, in *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, the First District, Second Division, of this court affirmed a jury's award of punitive damages against a defendant employer for willful and wanton entrustment. In that case, the plaintiff was injured when she was struck in a crosswalk by a cab driven by an employee of the defendant. She initially filed a complaint alleging negligence against both the driver and the employer, but she later amended her complaint to include claims of negligent operation of a motor vehicle; negligent entrustment; willful, reckless, and wanton entrustment; negligent hiring; and reckless, willful, and wanton hiring. Her reckless entrustment claims were based on the allegation that the employer should have been aware of the increased risk of harm to the public based on the driver's prior driving record. The employer conceded that the driver was negligent. Prior to trial,

the trial court dismissed the negligent entrustment claim but allowed the plaintiff to proceed on willful and wanton entrustment. *Id*. ¶¶ 2-9. At the end of the trial, the jury awarded the plaintiff compensatory and punitive damages, specifically finding the employer willfully and wantonly entrusted the cab to the driver. *Id*. ¶ 30.

¶ 121   On appeal, the employer raised several issues, including a claimed error by the trial court in denying its motion for a directed verdict and its motion for a JNOV because the plaintiff failed to present sufficient evidence to support a finding of willful and wanton entrustment. In its analysis, the reviewing court considered both *Ledesma* and *Richards*, which the employer asserted held that a prior driving record was irrelevant if the driver had appropriate licenses. *Id*. ¶¶ 37-40. The court disagreed, finding that neither case set forth a "bright line rule that a driver's license and chauffer's license alone are sufficient to insulate a cab company from liability for willful and wanton entrustment." *Id.* ¶ 43. The court distinguished its case from *Richards* and *Ledesma* by observing that in those cases, the employers had "certain practices and procedures when hiring a driver and adhered to them, [but the employer here] failed to follow its own vetting standards." *Id.* ¶ 45. The reviewing court affirmed the trial court's denial of the employer's motion for a JNOV on the willful and wanton entrustment. *Id*. ¶ 50.

¶ 122   Significantly, all three of these cases allowed the willful and wanton count to be considered on its merits following the trial court's dismissal of the underlying negligence counts after an admission of *respondeat superior* liability. See *Ledesma*, 182 Ill. App. 3d at 729-30; *Richards*, 168 Ill. App. 3d at 156; *Baumrucker*, 2017 IL App (1st) 161278, ¶¶ 35-50.

¶ 123 Finally, there are several policy reasons which support the trial court's decision. Defendants' position that all willful and wanton claims must fall once the principal admits vicarious liability for its agent allows an employer to avoid allegations directed at its own

conduct and allows the principal to insulate itself from those allegations. This position also permits a defendant in GES's position to direct a plaintiff's pleadings to its advantage in contrast to the settled principle that " '[p]laintiffs are masters of their complaint and are entitled to proceed under whichever theory they decide, so long as the evidence supports such a theory.' " *Smart v. City of Chicago*, 2013 IL App (1st) 120901, ¶ 54 (quoting *Reed v. Wal-Mart Stores, Inc.*, 298 Ill. App. 3d 712, 718 (1998)). It still remains the plaintiff's burden to both plead and prove all allegations of willful and wanton misconduct directed against the principal and only after doing so will a verdict be sustained. See *Ledesma*, 182 Ill. App. 3d at 729.

¶ 124 This interpretation also preserves the different purposes of compensatory and punitive damages. Compensatory damages are to compensate, that is, to make the plaintiff whole after the negligent conduct and are not to punish the tortfeasor. See *Wills v. Foster*, 229 Ill. 2d 393, 401 (2008) (quoting *Peterson v. Lou Bachrodt Chevrolet Co.*, 76 Ill. 2d 353, 363 (1979)). In contrast, the purpose of punitive damages is " 'to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future.' " *Doe v. Catholic Bishop of Chicago*, 2017 IL App (1st) 162388, ¶ 9 (quoting *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990)).

¶ 125 Defendants' reliance on *Samuels v. Checker Taxi Co.*, 65 Ill. App. 3d 63 (1978), does not change our analysis. In that case, the plaintiffs were in an accident with a cab driven by an employee of the defendant employer. They subsequently filed a six-count complaint against the employee and employer. The issues on appeal involved the dismissal of the counts alleging negligent entrustment and willful and wanton entrustment. The plaintiffs conceded that the negligent entrustment claims were properly dismissed under *Neff* but argued that the trial court

erred in dismissing their claims for willful and wanton entrustment for failure to state a cause of action. *Id*. at 64-65.

¶ 126   On appeal, the plaintiffs asserted that "there is no bar to a direct action against a principal, even when it has admitted liability for its driver's actions, where there are allegations of wilful and wanton conduct for which punitive damages are sought" and their complaint properly alleged willful and wanton conduct. *Id*. at 66. The reviewing court disagreed that the plaintiffs had sufficiently pled allegations of willful and wanton conduct and the court found that those allegations were the same as the allegations of negligent entrustment and were insufficient to constitute willful and wanton conduct. *Id*. at 66-67. The court then observed that even if it assumed *arguendo* "that under some circumstances punitive damages may be awarded against a principal," it concluded that the plaintiffs *failed to allege* willful and wanton conduct. *Id*. at 66. Contrary to defendants' assertion, the *Samuels* court did not dismiss the willful and wanton entrustment claim under *Neff* but instead held that the plaintiffs had failed to state a cause of action. The *Neff* rule was not considered in the analysis of the willful and wanton claims and defendants' citation of *Samuels* does not support its argument. Additionally, we find defendants' reliance on *Ledesma* claiming the willful and wanton conduct count could not stand after GES admitted *respondeat superior* liability for the willful and wanton action's of Neirinckx lacks merit for the reasons outlined above.

¶ 127   We conclude a stipulation by an employer to its employee's negligent conduct does not eliminate the employer's liability for its own willful and wanton conduct. Accordingly, the stipulation entered into here by GES ("admitting *respondeat superior* for any willful and wanton conduct by Fred Neirinckx should any be found against him") did not eliminate its liability for its own willful and wanton conduct. Therefore, the trial court did not err in allowing the willful and

wanton count against both the employer and the employee to go to the jury for its ultimate decision. See *Ledesma*, 182 Ill. App. 3d 718, *Arrington's Estate*, 578 S.W.2d 173, *Hines*, 547 S.W.2d 378 (All cases allowing a plaintiff to maintain separate counts of willful and wanton conduct against an employee and employer after an employer's stipulation of *respondeat superior*.)

¶ 128 Next, we briefly address defendants' claim that since the allegations of negligence against GES were dismissed, there is no count upon which the willful and wanton count against GES can stand. Defendant contends that there is no such action for a standalone willful and wanton misconduct claim against the employer.

¶ 129 While we readily acknowledge a willful and wanton count does not comprise an independent tort (see *Jane Doe-3 v. McLean County Unit Dist. No. 5 Board of Directors*, 2012 IL 112479, ¶ 19), contrary to defendant's position, in this case the negligence allegations underlying plaintiff's willful and wanton claim were present in the fifth amended complaint. Here, count I of the fifth amended complaint contains an allegation that supports the later claim of willful and wanton conduct by GES. Paragraph 12 of the complaint, which was realleged in both count II and count III, states:

"While operating the forklift for the move out phase of the 2012 IMTS, NEIRINCKX had not been trained, evaluated, and certified in the safe operation of power industrial trucks as required by GES's company policy and 29 CFR 1910.178(I)(1)(i), 29 CFR 1910.178 (I)(1)(ii), and 29 CFR 1910.178(I)(4)(iii)."

¶ 130 Thus, the basis for the willful and wanton claim was alleged within the claim for negligence, and defendants' argument fails. And, the decisions cited above dispel defendants'

48

claim that when an employer admits negligence and a negligent entrustment claim is dismissed as duplicative, a willful and wanton count based upon the negligent entrustment must also fail. See *Baumrucker*, 2017 IL App (1st) 161278, ¶¶ 35-50.

¶ 131   In his cross-appeal, which we chose to address next, plaintiff argues that the trial court erred in granting the JNOV on count III based on the court's finding of a lack of causation. Specifically, plaintiff contends that the evidence presented at trial supported the jury's verdict and the jury's consistent answers to the special interrogatories. Plaintiff requests the punitive damages award be reinstated.

¶ 132   " 'A directed verdict or a judgment *n.o.v.* is properly entered in those limited cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." ' " *Baumrucker*, 2017 IL App (1st) 161278, ¶ 33 (quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992), quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). " '[A] judgment *n.o.v.* may not be granted merely because a verdict is against the manifest weight of the evidence.' " *Id.* (quoting *Maple*, 151 Ill. 2d at 453). "In other words, a motion for judgment *n.o.v.* presents 'a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942)). A "judgment *n.o.v.* is inappropriate if 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' " *Id.* (quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995)). We review a trial court's decision on a motion for JNOV *de novo*. *Id.*

¶ 133 "The Illinois Supreme Court has defined willful and wanton misconduct as a course of action showing actual intent or reckless disregard for the safety of others." *Baumrucker*, 2017 IL App (1st) 161278, ¶ 35 (citing *Klatt v. Commonwealth Edison Co.*, 33 Ill. 2d 481, 488 (1965)). "Whether particular conduct can be characterized as willful and wanton depends on each case's facts and ordinarily presents a question of fact for the jury to determine." *Id*. As previously stated, "[t]here is no separate, independent tort of willful and wanton conduct"; instead "willful and wanton conduct is considered an aggravated form of negligence." *Jane Doe-3*, 2012 IL 112479, ¶ 19. "In order to recover damages based on willful and wanton conduct, a plaintiff must plead and prove the basic elements of a negligence claim—that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was a proximate cause of the plaintiff's injury." *Id*. "In addition, a plaintiff must allege either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Id*.

¶ 134 Plaintiff's claim for willful and wanton conduct against GES was based primarily on allegations of negligent hiring. "An action for negligent hiring or retention of an employee requires the plaintiff to plead and prove (1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury." *Van Horne v. Muller*, 185 Ill. 2d 299, 311 (1998). Under this theory, "the proximate cause of the plaintiff's injury is the employer's negligence in hiring or retaining the employee, rather than the employee's wrongful act." *Id*. "[P]roximate cause 'need not be the only, last or nearest cause; it is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes injury.' " *Garest v. Booth*, 2014 IL App (1st) 121845,

¶ 41 (quoting *Leone v. City of Chicago*, 235 Ill. App. 3d 595, 603 (1992)). "Thus, if there is more than one proximate cause of an injury, one guilty of negligence cannot avoid liability simply because another person was also guilty of negligence contributing to the same injury, even if the injury would not have occurred but for the latter person's negligence." *Id*.

¶ 135 Here, the trial court entered a JNOV on count III which alleged willful and wanton conduct by GES and reversed the jury's verdict in favor of plaintiff as well as an award of $3 million in punitive damages. Count III of plaintiff's fifth amended complaint alleged in relevant part that Neirinckx was not trained, evaluated or certified in the operation of the forklift as required by GES's company policy and the Code of Federal Regulations. Plaintiff named 14 individuals employed by GES at IMTS in 2012, either in a full-time capacity or hired specifically for that show. GES made the decision to implement a policy setting the crew size for the Versa Lift to two people. During the IMTS show, OSHA regulations required all forklift operators be trained and evaluated for competency every three years. At IMTS in 2012, GES did not have a procedure in place to verify that each forklift operator had been trained and evaluated within the prior three years. It is undisputed that Neirinckx was not certified to operate the Versa Lift.

¶ 136 Plaintiff further alleged that GES had a duty not to hire individuals unfit for employment and through its agents and employees, to refrain from willful and wanton conduct and that GES was reckless in employing Neirinckx. Count III alleged willful and wanton conduct as follows:

> "At all times relevant, and during the 2012 IMTS, in breach of its aforementioned duties, GES, by and through its duly authorized agents, servants and/or employees, including managerial employees acting within the scope of their employment, acted with utter indifference to and/or with conscious

51

disregard for [plaintiff's] safety in one or more of the following

respects:

a) failed to assign a three-person crew for [Versa Lift] that

Neirinckx was operating;

b) failed to implement a procedure by which forklift

operators' certifications were checked at IMTS; and/or

c) failed to ensure that defendant Neirinckx was trained in

the operation of the [Versa Lift]."

Plaintiff asserted that "as a direct and proximate result of the willful and wanton conduct," plaintiff sustained severe personal injury.

¶ 137   In granting the JNOV on this count, the trial court concluded that if certifications had been checked at the beginning of the show, then Neirinckx would have been sent for training and there was "no evidence for the jury to find that training would have changed Neirinckx's behavior, as he knew everything that would have been taught in training class." The court held that plaintiff failed to establish a sufficient basis for proximate cause. We disagree.

¶ 138   At trial, the jury heard the following evidence related to GES's alleged willful and wanton conduct. Neirinckx had been semiretired for approximately 8 to 10 years, when he would work two shows every other year. Though he had worked as a forklift operator his entire career, he admitted that he had never been trained on the 58,000-pound Versa Lift. Moreover, he conceded that he had not been certified or trained as required by OSHA regulations since the 1990s. He admitted that he was never taught that he should not operate the Versa Lift unless a spotter was in place or that he should communicate with other people nearby before moving the forklift. Neirinckx could not be "grandfathered" into use of the Versa Lift without training and

certification. Neirinckx also admitted to operating the forklift prior to the accident without a spotter. It is uncontested that defendants admitted that Neirinckx acted negligently.

¶ 139   Nash testified that on the morning of the accident, he observed Neirinckx operating the Versa Lift without a spotter and had seen Neirinckx operate in this manner previously. He informed Burns about his concerns that Neirinckx was unsafe. Nash also testified that he believed that due to the size of the Versa Lift, a three-man crew to operate it safely should have been assigned because of the blind spots in front and to the right. However, Nash and Neirinckx worked as a two-person crew.

¶ 140   Local 136 coordinator O'Connell testified that the union trains people to watch for pedestrians, to use hand signals while moving, and to sound the horn as a warning. He further stated that the Versa Lift is "notorious" for its blind spots in the front and to the right.

¶ 141   Plaintiff presented extensive evidence through GES employees regarding the company's certification procedures which were essentially nonexistent and GES's past citations for failing to check certifications. GES supervisor Gibas testified that he hired Neirinckx based on Neirinckx's prior work. Neirinckx was known to be fast and often unloaded the heaviest pieces faster, which was why Gibas wanted Neirinckx to work at IMTS 2012. He was aware of the requirement that all forklift operators needed to be trained and certified, but he was not informed that he was to check certification. He did not check certifications and did not instruct anyone else to check. Gibas admitted that a forklift operator should have a spotter and it was "reckless" to make a pick without one. Further, he testified that it was a safety rule not to move the Versa Lift in the presence of pedestrians without a spotter.

¶ 142   Several GES employees admitted that Neirinckx should have been certified. Johnson testified operations should have checked certification at IMTS in 2012 and if no one did so, then

53

it was a violation of OSHA safety rules and GES's policies. He agreed that Neirinckx should have been certified. Johnson was the safety manager when the 2009 OSHA violation occurred. Carroll admitted that GES had the responsibility of ensuring that all employees at IMTS in 2012 were trained to operate forklifts. He testified that GES violated a safety rule and Neirinckx should not have been hired based on his lack of certification. He admitted that GES did not have a process in place to check certification for IMTS 2012 and should have been checking the operators hired directly by GES. Carroll was also aware that when there is pedestrian traffic, an operator of a Versa Lift should not move the forklift without a spotter to assist. Madrigal questioned whether he was the person to ask about GES's process to check certification, but he believed there was a process that was not followed.

¶ 143   Mata also admitted that he knew that forklift operators had to be trained and certified every three years regardless of experience as required by OSHA regulations, but no procedure existed for GES to check certifications at IMTS in 2012. He further admitted to a lack of such procedure at prior IMTS shows. Mata further admitted that not checking forklift operators for appropriate certification "needlessly endangered people on the floor," including exhibitors. He agreed that there should have been a process in place to check certification. Mata also testified that the Illinois legislature had previously required a three-person crew for every forklift but the law was changed in 2010 to only require a minimum two-person crew. GES had the ability to assign an extra crew member as safety required. GES decided for IMTS in 2012 that the Versa Lift would not have a three-person crew.

¶ 144 While multiple GES employees testified that they were unaware of the OSHA requirement for retraining after an accident, some GES employees were aware of this requirement and none directed Neirinckx to such retraining. Further, GES employees failed to

remove Neirinckx from the show floor after the accident and offered testimony that repeatedly shifted the responsibility to a subsequent individual. Carroll testified that he left a voicemail directing Madrigal to send Neirinckx and Nash home. Madrigal admitted to receiving the voicemail and directed Gibas to send them home. In contrast, Gibas testified that no one told him to send Neirinckx home.

¶ 145 Pinnock discussed GES's Lean Six Sigma managerial plan, which reduced safety managers nationwide to two with no safety manager in Chicago. He testified that OSHA regulations were the minimum safety standards. He stated that it was "absolutely" within GES's policy to ensure its forklift operators were certified to protect human safety. Pinnock admitted that GES had previously been cited by OSHA in 2004 and 2009 for the same failure to ensure its forklift operators were certified. In response to both violations, GES opted for an abatement process to show that corrective measures had been adopted. Pinnock understood that corrective measures were to be in place "forever." Thus, the jury had been made aware that although GES had been cited twice before for the same violation, GES continued to operate without any regard for the mandatory certification of its operators.

¶ 146 Additional evidence demonstrated how GES made a profit in drayage and the reason GES wanted Neirinckx to work was because he was fast, which related to more profits.

¶ 147 Further, the defense expert Avery admitted a spotter is necessary on the Versa Lift. Avery also agreed training and certification is of "utmost importance" to avoid injuries, and he testified that it is important for operators to acquire, retain, and use the necessary knowledge and skills to operate a forklift, which is why certification is required every three years. Avery admitted that he would expect someone like Neirinckx to know safety rules, such as not operating a Versa Lift in the presence of pedestrians without a spotter. If Neirinckx did not know this, Avery had

55

"reservations with respect to his abilities." GES was aware of the safety rules prior to the accident. If someone had made sure Neirinckx was trained, he would have been aware of these safety rules. He also agreed that the employer was responsible for checking certification and GES had no procedure in place to do so. Finally, though GES had been cited for the same types of violations on two prior occasions in 2004 and again in 2009, it continued to staff shows without any regard for the mandatory certification of operators of machines that could cause "devastating" injuries.

¶ 148   All of the foregoing evidence was presented to the jury and the jury found in favor of plaintiff and against GES on count III and assessed punitive damages. The jury further answered a special interrogatory indicating that it found GES's conduct to be willful and wanton and that GES's conduct proximately caused plaintiff's injury.

¶ 149   After considering the evidence in the light most favorable to plaintiff, we cannot say that the evidence so overwhelmingly favored GES that no contrary verdict could ever stand. The evidence presented at trial and the rational inferences to be drawn from them sufficiently set forth all the elements required to establish that GES's failure to have a process to ensure all forklift operators were certified and trained, its deliberate actions in ignoring this failure after two previous violations in the same regard, and its failure to ensure that Neirinckx was trained in the operation of the Versa Lift proximately caused plaintiff's injury. We cannot say that there was "a total failure or lack of evidence to prove any necessary element," and we do not find that there was a lack of evidence of proximate cause. See *York*, 222 Ill. 2d at 178. Accordingly, we conclude that the JNOV was incorrectly granted. We reverse the entry of JNOV on count III and reinstate the jury's verdict and punitive damages.

¶ 150 Defendants raise several additional claims of error, but all are based upon the alleged error of allowing count III to proceed to trial. Since we have concluded that the trial court did not err in allowing count III to go forward and that the JNOV was improperly granted, many of defendants' claims fall. We address only the alleged errors that remain pending in light of this conclusion.

¶ 151 Defendants assert several errors related to the improper admission of evidence. Specifically, defendants contend that (1) the trial court erred in allowing post-occurrence evidence to be admitted at trial and that a later curative instruction to limit the consideration of such evidence failed to ameliorate the error, (2) evidence of unrelated bad acts was inadmissible, and (3) OSHA violations were not admissible to show willful and wanton conduct.

¶ 152 As to the admission of post-occurrence evidence, defendant argues that the trial court allowed improper evidence that GES allowed Neirinckx to continue working after the accident without suspension or retraining and the alleged reasons for this. GES also complains that it was error to allow testimony regarding GES's alleged profit motivations in moving the show out quickly, evidence regarding GES's conduct during OSHA's post-accident investigation, and evidence that GES did not ascertain Neirinckx's certification status after the accident.

¶ 153 For this claim, defendants rely on the well-settled rule that "evidence of subsequent remedial measures is not admissible as proof of negligence." *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 14 (1989). " '[A] post-occurrence change is insufficiently probative of prior negligence, because later carefulness does not necessarily imply prior neglect.' " *Id*. (quoting *Lundy v. Whiting Corp*., 93 Ill. App. 3d 244, 252 (1981)). However, in this instance, none of the post-occurrence evidence was related to remedial measures but concerned GES's continued failure to adhere to OSHA requirements.

¶ 154   Moreover, during the trial, the circuit court discussed with the parties the admissibility of post-occurrence evidence. After allowing both sides to present argument, the court held that post-occurrence conduct related to GES allowing Neirinckx to continue working "in derogation of the OSHA requirement that he be retrained and certified" was "sufficiently related to the underlying claim in the case which is the claim of hiring him when he wasn't certified and not trained. And then keeping him on when he wasn't certified and not trained, I think is significantly enough related that it can come in." Prior to closing arguments, the trial court instructed the jury on this point.

> "During the course of the trial you heard evidence about events and conduct involving the defendants Neirinckx and GES and OSHA which occurred after the plaintiff's injury; specifically interactions between the defendants and OSHA and defendant GES' motivation in allowing Neirinckx to continue to work. That evidence is not relevant to any issue you will have to decide. Therefore, that evidence is stricken and you are instructed to disregard it entirely. You may, however, consider the fact that the defendant Neirinckx was allowed to continue working after the occurrence."

¶ 155   Defendants contend that this instruction failed to cure any error in the presentation of inadmissible evidence, but fail to cite any relevant Illinois authority to support their argument. Instead they provide a general citation to an out-of-state criminal case. Illinois Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the

58

pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). It is well-settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff v. Dever*, 194 Ill. App. 3d 147, 155-56 (1990). Arguments unsupported by citation to legal authority are considered as forfeited on appeal. *Id*. Therefore, we find this issue is forfeited.

¶ 156 Further, "[i]t is presumed that the jury understood and followed the court's instructions." *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 20 (citing *McDonnell v. McPartlin*, 192 Ill. 2d 505, 535 (2000)). Defendants offer only speculation that the jury disregarded the limiting instruction. Absent any evidence to the contrary, we will presume the jury adhered to the trial court's instruction and only considered admissible evidence in reaching its verdict. Since defendants have not presented any evidence to the contrary, we presume the jury adhered to the trial court's instructions in this case. Additionally, if the trial court's instruction did not cure any error in the presentation of inadmissible evidence, we find any error would have been harmless.

¶ 157 Moreover, even if it was improper for the jury consider the fact that Neirinckx was allowed to continue working after the occurrence, we find any error related to that evidence also would be harmless error. "Reversal on appeal is not required unless an erroneous evidentiary ruling was substantially prejudicial, and the burden of establishing prejudice is on the party seeking reversal." *Shachter v. City of Chicago*, 2011 IL App (1st) 103582, ¶ 80. "As such, any improper evidentiary rulings may be considered harmless error." *Id*. An error is considered harmless when the jury would not have reached a different verdict because of the significant evidence presented. See *Ready v. United/Goedecke Services, Inc.*, 238 Ill. 2d 582, 592 (2010). In this case, defendants have failed to show prejudice resulted from the admission of the post

occurrence evidence or that its admission affected the outcome of the trial. Given the substantial evidence presented at trial related to GES's conduct as fully discussed above, the evidence that Neirinckx continued to operate the forklift after the accident and still was given no training did not prejudice GES. Based upon our review of the entire record, we cannot find the exclusion of this evidence would have changed the jury's verdict in this case. Thus, any error was harmless.

¶ 158   Defendants also argue that the trial court erred in admitting evidence of unrelated bad acts to show willful and wanton conduct. Specifically, defendants contend that evidence relating to GES's adoption of Lean Six Sigma management principles and the reduction of safety managers, overtime hours of forklift operators at IMTS in 2012, GES's profits and productivity including how GES is paid by drayage and wanting workers who could move shows in and out with minimum delays, and GES's prior OSHA violations in 2004 and 2009 were erroneously admitted at trial.

¶ 159   In support, defendants cite the United States Supreme Court decision in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 422-23 (2003). The Court stated: "A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business."

¶ 160   However, the evidence detailed by defendants was relevant to the issues at trial and was not unrelated. Evidence relating to GES's safety procedures and motivations was probative of the claim that GES failed to institute a procedure to check certifications of forklift operators and of plaintiff's claim that use of only a two-person crew was willful and wanton. This evidence went to the jury's determination of whether GES acted with utter indifference or the conscious disregard to the safety of others.

¶ 161   As plaintiff points out, Illinois Pattern Jury Instruction 35.01 instructs the jury when deciding an award of punitive damages to consider several points, including the facts and circumstances of defendant's conduct, the duration of the misconduct, the frequency of defendant's misconduct, and whether defendant tried to conceal the misconduct. Illinois Pattern Jury Instructions, Civil, No. 35.01 (2006) (hereinafter IPI Civil (2006) No. 35.01). Accordingly, we find no error as this evidence was probative as to whether GES's conduct was willful and wanton.

¶ 162   Defendants further assert that the OSHA violations were inadmissible to prove willful and wanton conduct. Defendants' argument on this issue consists of two short paragraphs and the citation of two cases purporting to support their contention that OSHA violations can only be used as evidence of negligence, but cannot constitute evidence of willful and wanton conduct. See *Feldscher v. E&B, Inc.*, 95 Ill. 2d 360, 370 (1983); *Recio v. GR-MHA Corp.*, 366 Ill. App. 3d 48, 57 (2006). However, neither case considered the admissibility of OSHA violations for claims of willful and wanton conduct. As previously discussed, Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). As pointed out above, a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff*, 194 Ill. App. 3d at 155-56. Defendants have failed to cite any authority holding that OSHA violations are inadmissible as evidence of willful and wanton conduct. [1]   We see no

---

[1] We point out that GES quoted from an unpublished order for its legal background on punitive damages in Illinois. Unpublished orders have no precedential value and are distributed with the express warning: "NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1)." Ill. S. Ct. R. 23 (eff. Jan. 1, 2011). See *Castrejon v. Tijerina*,

reason why this evidence regarding OSHA violations was not relevant to the determination of GES's willful and wanton misconduct and was properly admitted at trial.

¶ 163   Defendants also argue that the trial court improperly allowed evidence on the issue of whether GES ratified Neirinckx's conduct. The jury, however, concluded that GES did not ratify Neirinckx's conduct in a special interrogatory. " 'A party cannot complain of error which does not prejudicially affect it, and one who has obtained by judgment all that has been asked for *** cannot appeal from the judgment.' " *Strategic Energy, LLC v. Illinois Commerce Comm'n*, 369 Ill. App. 3d 238, 245 (2006) (quoting *Material Service Corp. v. Department of Revenue*, 98 Ill.2d 382, 386 (1983)). "The general rule is that the successful party cannot appeal from those parts of a decree that are in its favor in order to reverse other aspects of the decree." *Id*. "The appellate forum is not afforded to successful parties who may not agree with the reasons, conclusions, or findings below." *Id*. (citing *Geer v. Kadera*, 173 Ill. 2d 398, 414 (1996)). Since defendants were successful on the issue of ratification, they may not complain of any error on appeal and we will not consider this issue.

¶ 164   Defendants also raise multiple claims of evidentiary errors as to the negligence count at trial. Specifically, defendants assert that (1) improper communications to the jury by one of plaintiff's treating physicians deprived them of a fair trial and (2) testimony of plaintiff's military service and testimony from his fiancée, mother, and friend from the military was irrelevant and sympathy provoking. Once again, plaintiff fails to cite any relevant authority for either claim. Since Rule 341(h)(7) is not satisfied by argument without citation to relevant authority, these contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff*, 194 Ill. App. 3d at 155-56.

---

2016 IL App (1st) 151661-U. GES does not come within any of the stated exceptions for citing to an unpublished order and we will not condone its violation of the mandatory rule by considering such orders. *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 17, 961 N.E.2d 475.

¶ 165   Further, the first claim of error relates to improper communication by the physician to the jury during a sidebar in which he asked the jurors if the medical illustrations were "disturbing" and said that while "normal" for him, the illustrations are "disgusting to many." Following the sidebar, the trial court instructed the jury to disregard the comments. Defendants only offer a conclusory statement that the instruction to disregard did not cure the improper comments. As discussed above, we will "presume[ ] the jury understood and followed the court's instructions." *Babikian*, 2011 IL App (1st) 102579, ¶ 20.

¶ 166   As to the claims related to testimony about military service and personal witnesses, defendants cite a single authority that the evidence of military service should have been excluded as "irrelevant and sympathy provoking." *Vander Veen v. Yellow Cab Co.*, 89 Ill. App. 2d 91, 99-100 (1967). In that case, the defendant argued that a plaintiff should not have been allowed to present military service in World War II as rebuttal evidence when the plaintiff admitted the testimony was irrelevant and was used to rebut the suggestion that the plaintiff's injury was due to a swimming accident. *Id.* We find this case inapposite to the question of whether testimony about plaintiff's military service was admissible in the instant case.

¶ 167   "The admission of evidence is within the sound discretion of the trial court and we will not reverse the court's ruling unless that discretion was clearly abused." *Jacobs v. Yellow Cab Affiliation, Inc.*, 2017 IL App (1st) 151107, ¶ 35 (citing *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993)). Moreover, IPI Civil (2006) No. 30.04.01 provides for the "[l]oss of a normal life experienced (and reasonably certain to be experienced in the future)" to be included as a measure for compensatory damages given to the jury. IPI Civil No. 30.04.01; see also *Turner v. Williams*, 326 Ill. App. 3d 541, 551 (2001). Accordingly, testimony regarding plaintiff's military service

63

and his life prior to the accident was admissible and within the trial court's discretion. Defendants fail to establish any basis for this court to find an abuse of such discretion.

¶ 168   Finally, defendants contend that they are entitled to a remittitur of the compensatory damages from $12,228,068 to $3,214,593. However, defendants offer no explanation as to how their proposed figure has been determined other than to direct the court to their attorney's closing argument in the record on appeal. Defendants assert in two paragraphs that the remittitur should be granted because the jury's award of compensatory damages was excessive. Again, defendants cite a single case generally as to when a remittitur should be granted and fail to argue the basis for their contention instead incorporating all of their foregoing arguments. The single case cited, *Drakeford v. University of Chicago Hospitals*, 2013 IL App (1st) 111366, was abrogated on other grounds by the Illinois Supreme Court in *Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200.

¶ 169    "[A] remittitur should be employed only when a jury's award falls outside the range of fair and reasonable compensation, appears to be the result of passion or prejudice, or is so large that it shocks the judicial conscience; it should not be ordered if the award ' "falls within the flexible range of conclusions which can reasonably be supported by the facts." ' " *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 67 (quoting *Epping v. Commonwealth Edison Co.*, 315 Ill. App. 3d 1069, 1072 (2000), quoting *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470 (1992)). It is well settled that the amount of damages to be assessed is peculiarly a question of fact for the jury to determine and that great weight must be given to the jury's decision. *Snelson v. Kamm*, 204 Ill. 2d 1, 36-37 (2003). "The very nature of personal injury cases makes it impossible to establish a precise formula to determine whether a particular award is excessive or not." *Id.* at 37. "[A] court reviewing a jury's assessment of damages should not interfere unless a

proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered." *Id.*

¶ 170   We find no basis to enter a remittitur here. The evidence at trial established that plaintiff was a healthy, 30-year-old man at the time of the accident. He has endured extensive pain, surgeries and physical therapy to recover from the injury to his foot and ankle. He will continue to suffer pain throughout his life, will walk with an abnormal gait and often needs a cane. Plaintiff also lost his military career and his job with Hermle. There was also testimony relating to the psychological effects of this injury on the loss of his prior life and what he will experience going forward. Given this evidence, we cannot say that the jury's assessment of compensatory damages resulted from passion or prejudice or bears no reasonable relationship to the loss suffered by plaintiff. Accordingly, we decline to enter a remittitur on compensatory damages.

¶ 171   Based on the foregoing reasons, we affirm the trial court's decision to deny a motion for a new trial as to count I and to deny defendants' request for a remittitur on the compensatory damages assessed under count I. We reverse the trial court's grant of JNOV on count III and reinstate the jury's verdict and the award of $3 million in punitive damages against GES.

¶ 172   Affirmed in part and reversed in part.